In re PYRAMID OPERATING AUTHOR-ITY, INC., a/k/a Pyramid Arena Design, and Pyramid Management Authority, Inc., Debtors.

PYRAMID OPERATING AUTHORITY, INC., a/k/a Pyramid Arena Design, Pyramid Management Authority, Inc., and Sidney L. Shlenker, Intervenor, Movants,

v.

CITY OF MEMPHIS, County of Shelby, Tennessee Board of Regents, and Memphis State University, Respondents.

Bankruptcy Nos. 91–27959–D, 91–27960–D.

United States Bankruptcy Court, W.D. Tennessee, W.D.

Aug. 25, 1992.

Harris P. Quinn, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, Tenn., for City of Memphis, Tenn. and County of Shelby, Tenn.

William C. Gosnell, Memphis, Tenn., for debtors.

Bruce S. Kramer, Borod & Kramer, Memphis, Tenn., for Sidney L. Shlenker.

J. Robert Walker, William Young, Asst. Attys. Gen., State of Tenn., Nashville, Tenn., for Memphis State University.

William Jeter, Memphis, Tenn., for John Tigrett.

John Ryder, Memphis, Tenn.

Julie Chinn, Memphis, Tenn., Asst. U.S. Trustee.

Louis Lucas, Germantown, Tenn.

Monice Hagler, City Atty., Memphis, Tenn.

Brian Kuhn, Memphis, Tenn., for County.

David Blaylock, Memphis, Tenn.

Richard T. Doughtie III, Memphis, Tenn.

CORRECTED [1] MEMORANDUM OPINION AND ORDER RE DEBTORS' MOTION TO ASSUME HARD ROCK LEASE AGREEMENT AND PYRAMID MANAGEMENT AGREEMENT WITH THE CITY OF MEMPHIS AND COUNTY OF SHELBY FOR THE PYRAMID ARENA, AND MANAGEMENT AGREEMENT WITH THE TENNESSEE BOARD OF REGENTS AND MEMPHIS STATE UNIVERSITY

BERNICE BOUIE DONALD,
Bankruptcy Judge.

These core proceedings [2] came on to be heard on debtors' motion to assume certain alleged executory contracts and unexpired leases pursuant to the provisions of 11 U.S.C. § 365. This Court has jurisdiction by virtue of 28 U.S.C. §§ 1334(b) and 157(b)(2)(A) and (O). The common and ultimate issues before the Court for judicial determination are whether the actions of the City of Memphis ("City"), Shelby County Government ("County"), and Memphis State University ("MSU") (sometimes collectively referred to as "Respondents"), in sending the debtors letters of termination based on certain alleged defaults some five (5) to six (6) weeks before the petition filing, effectively terminated the management contract and arena leases such that they were no longer capable of assumption pursuant to 11 U.S.C. § 365. This overarching issue will be examined in the context of a number of sub-issues.

The following shall constitute findings of fact and conclusions of law pursuant to F.R.B.P. 7052 made applicable to these contested proceedings by virtue of F.R.B.P. 9014.

## BACKGROUND FACTS

Debtors, Pyramid Management Authority ("PMA") and Pyramid Operating Authority ("POA"), along with several related entities, collectively referred to as "debtors" filed chapter 11 petitions in the Bankruptcy Court on July 23, 1991 seeking to reorganize.[3] On June 17 and 26, 1991, the City, County and MSU respectively purportedly terminated certain contracts and leases in which the debtors claim an interest. Debtors subsequently filed motions to assume the contracts and/or leases (Pyramid Management Agreement, Hard Rock Lease, and MSU Agreement) in question, on September 20, 1991, within the sixty (60) day period required by the Bankruptcy Code to assume or reject leases or executory contracts. These three (3) motions were combined for hearing since the contracts sought to be assumed related to the debtors' prepetition activities at the Pyramid arena. By order of this Court, entered on October 1, 1991, the hearing on these motions was bifurcated to allow for the initial consideration of the prepetition purported termination of the respective contracts as a threshold issue, reserving the assumption issue for a later date.

---

**1.** Corrected for typographical and stylistic purposes only.

**2.** The Court finds that the determination as to the legal existence or non-existence of the leases is germane to defining property of these particular bankruptcy estates, such that it is core. The Court is mindful of the 6th Circuit decision in *Cain Partnership, Ltd. v. Pioneer Inv. Servs. Co., (In re Pioneer Inv. Servs. Co.)*, 946 F.2d 445 (6th Cir.1991), *reh'g denied, cert. denied,* — U.S. ——, 112 S.Ct. 2304, 119 L.Ed.2d 226 (1992), that such questions may be non-core. At the outset of these proceedings, the Court discussed the Sixth Circuit case with the parties, who *consented* to the jurisdiction of this Court to enter a final order subject to review under 28 U.S.C. § 158(a). Therefore, the core versus non-core dichotomy is not at issue in these particular proceedings.

**3.** The following cases collectively referred to as "The Pyramid Companies," were filed seeking relief under chapter 11:

| | |
|---|---|
| Pyramid Joint Venture Island Management Authority, Inc. | Case No. 91–27955D |
| | Case No. 91–27956D |
| H.R.C. (Memphis), Inc. a/k/a Hard Rock Cafe International (Memphis), Inc. | Case No. 91–27957D |
| Pyramid Sponsorship Joint Venture | Case No. 91–27958D |
| Pyramid Operating Authority, Inc. | Case No. 91–27959D |
| Pyramid Management Authority, Inc., Debtors. | Case No. 91–27960D |

The proof respecting this issue was commenced on January 22, 1992. At the conclusion of PMA's and POA's proof, respondents moved to dismiss the respective motions by PMA and POA. In an order dated March 16, 1992, in accordance with F.R.Civ.P. 41(b) or [Fed.R.Civ.P. 52(c)], this Court declined to render judgment until presentation of all the evidence. The proof was concluded on April 27, 1992, and closing arguments were presented by the respective parties on May 15, 1992, at which time the City, County, and MSU renewed their prior motions to dismiss PMA's and POA's motions respecting assumption of the contracts with the City and County, MSU, and TBR. The parties were given until June 15, 1992 to file post-trial briefs.

At the core of these contested matters is PMA's and POA's role in the construction and management of the Pyramid arena. The Memphis Pyramid concept arose following an investigation by prominent Memphis citizens through a Sports Authority Commission ("SAC") into the need for a downtown sports arena. John Tigrett, who was a member of SAC, took the concept of a pyramid-shaped facility on the south bluff in downtown Memphis to the City and County Mayors. The proposal was submitted to the Mayors of both the City and County in September, 1986. This proposal included an arena enclosed in a pyramid structure with an observation deck at the top. The concept was later amended to include museum and restaurant facilities within the pyramid structure as well.

Tigrett led a group of businessmen who agreed to supply the three hundred thousand dollars ($300,000) needed to obtain a bonded, fixed-price quote from Huber, Hunt & Nichols ("HHN" or "contractor"), a construction contracting firm, on a fixed-cost, design-build contract for a pyramid-shaped multi-purpose arena which included the arena and leased space within the arena building (the "Pyramid").

By November 1987, based on local community support, a Public Building Authority ("PBA") was formed to investigate the feasibility of constructing such a facility in the downtown area and ultimately to proceed with its development. The PBA issued a report to the City Council and County Commission dated February 1, 1988. As authorized by these respective local legislative bodies, the Pyramid project ("Pyramid") was to be developed by the PBA as owner and leased back to the City and County for operation. Construction was to proceed under a negotiated design-build contract with the contractor which would be responsible for the detailed design as well as the construction of the Pyramid. Huber, Hunt and Nichols ("HHN") was selected as the contractor.

With funds from the City, County and State of Tennessee, PBA built the Pyramid under the HHN fixed-cost, design-build contract. Rosser Fabrap International ("RFI") was HHN's architect. Under a design-build approach, the contractor is responsible for employing the architect. Since Rosser Fabrap was under the employ of HHN, PBA needed a professional to oversee the construction and hired the Pickering Firm ("Pickering") for that purpose. David Bennett ("Bennett") of Pickering served as PBA's construction manager.

The PBA, through a lease agreement ("Hard Rock Lease"),[4] committed to leasing certain portions of the Pyramid (the "leased premises") to Hard Rock Cafe International (Memphis), Inc. ("Hard Rock Memphis") for the development of the observation deck, museum and restaurant portions of the Pyramid.

Hard Rock Memphis was a wholly-owned subsidiary of Hard Rock Cafe International (Del.), Inc. ("Hard Rock International"). Hard Rock International was subsequently purchased by an English company. Thereafter, in early September, 1988, Hard Rock International disclaimed any intent to be involved with Hard Rock Memphis and the Lease Agreement. This left Hard Rock Memphis without the support of the parent

---

4. See Trial Ex. 6, Lease Agreement between PBA and Hard Rock Memphis, executed June 27, 1988.

company. Without the parent company supplying the franchise to operate a Hard Rock Cafe in the Pyramid, Hard Rock Memphis had to, and did, purchase a Hard Rock Cafe franchise (the "Franchise Agreement") in order to perform its lease obligations which included the construction and operation of a Hard Rock Cafe.

Hard Rock Memphis assigned the Lease Agreement to Pyramid Operating Authority, Inc. ("POA"). Criss at 62–63; Ex. 10. POA, wholly-owned by Sidney Shlenker, sub-leased a portion of the leased premises back to Hard Rock Memphis so that Hard Rock Memphis could operate the Hard Rock Cafe.

Under a Finance and Use Agreement,[5] dated August 26, 1988, between the State of Tennessee and the City and County, the State agreed to contribute $7.0 million toward the construction of the Pyramid in return for which Memphis State University ("MSU") would receive certain rights related to the facility. These rights included priority use by the MSU basketball team, exclusive control over eleven (11) skyboxes during any event held in the arena ("MSU boxes"), use of ten (10) additional skyboxes during MSU athletic events ("non-MSU boxes"), control of non-food concessions during University events, and other privileges. Under the agreement, MSU was to furnish and equip the MSU boxes, leaving the remaining boxes [6] to be finished by the City and County.

The contractor was given notice to proceed with construction in September, 1988. Later that year, the City and County requested proposals from various companies regarding management of the arena portion of the Pyramid. PMA was selected from among several proposals received from this solicitation and negotiations were commenced to reach an agreement with that firm.[7]

These negotiations resulted in a management agreement (the "Management Agreement") dated April 14, 1989, wherein the City and County contracted with PMA to manage, operate, promote and market the Pyramid on their behalf. The Management Agreement became effective immediately upon execution and was to expire five (5) years after the opening of the Pyramid. Under the Management Agreement, the City and County are referred to as "Lessee" and PMA as "Manager." The Management Agreement requires PMA to manage and operate what commonly has been referred to as the arena portion of the Pyramid (defined as the "Public Facility" under the Management Agreement). PMA was to manage and operate the arena as *"a first class facility with integrity and in good faith."* The Management Agreement provides that it is to be governed by, construed and enforced in accordance with, the laws of the State of Tennessee.

As manager of the arena, PMA had certain specific duties under the Management Agreement. Some of these duties are

5. Trial Ex. 8.

6. In addition to the ten (10) non-MSU boxes, the agreement also provided for three (3) skyboxes under the exclusive control of the City, County and PBA which were required to be finished by the City/County. Consequently, with the eleven (11) MSU boxes to be finished by MSU, a total of twenty-four (24) skyboxes were provided for in the Finance and Use Agreement.

7. The City and County sought a manager for the arena portion of the Pyramid. Shlenker was introduced to Tigrett and then to City and County. City and County received several bids, including one from Shlenker, for the arena management contract. Under Shlenker's original proposal, the manager would receive an annual fee and a percentage of the revenues. Prior to the City and County selecting Shlenker

as their manager, he submitted an alternative proposal which provided that City and County would be paid a guaranteed annual amount by the management company. Shlenker at 1585–1586. The initial annual payment was to be three million dollars ($3,000,000.00).

During this period, Shlenker acquired the stock of POA from Tigrett. Since PMA had not yet been formed, POA entered into a Memorandum of Understanding with City and County for the management contract for the arena.

Under the Memorandum of Understanding, POA had the right to transfer its rights thereunder to another corporation controlled by Shlenker. POA designated PMA to enter into the Management Agreement. On April 14, 1989, a Management Agreement was executed by PMA, City and County. (See Trial Ex. 12). PMA, at this time, was owned by Shlenker and Tigrett.

found in Article 3, "Responsibilities of Manager." In their April 16, 1991 letter, the City and County declared PMA in default of Sections 3.01(i), (j), (o), (p), and (q) and 3.02(b), (e), (f), (i), (j), and (o) of the Management Agreement. See Trial Ex. 14. The basic arrangement under the Agreement was that PMA would pay the City and County an annual fee in return for giving PMA expansive independent business control over the operation of the Pyramid including payment of operating expenses and retention of operating revenues. PMA also was responsible for managing the interests of the City and County in all skyboxes available for lease by the City and County under the terms of the Finance and Use Agreement. PMA was to assume responsibility for providing certain equipment and furnishings in the Pyramid which would otherwise have been the responsibility of the City and County including "athletic flooring, goals, score tables, team benches, scoreboards, video display boards, telephone system equipment and wiring, in addition to locker room, concession, first-aid, janitorial, maintenance, and other equipment." The management authority given PMA under this agreement was subject to the terms and conditions of the Finance and Use Agreement between the City and County and the State. Trial Ex. 8.

A major element of the Management Agreement was the establishment by PMA of a reserve fund "in cash, letter of credit or equivalent" in the amount of three million dollars ($3,000,000) to be held in escrow by a mutually acceptable escrow agent "for the benefit of [the City and County]." The purpose of the fund was to provide the City and County with security in the event PMA failed to pay fees to the City and County otherwise owing under the Management Agreement. In a separate escrow agreement ("Escrow Agreement") executed on July 14, 1989, between PMA, the City, County, and Union Planters National Bank ("Union Planters"), the parties agreed that Union Planters would act as escrow agent and that the reserve fund could be funded, at PMA's option, in several ways.[8] In the event marketable securities were placed in escrow, the securities were required to have a value of at least one hundred ten percent (110%) of the required reserve fund amount of three million three hundred thousand dollars (i.e., $3,300,000.00). It was agreed by the parties that the initial escrow deposit would be in the form of certain stock certificates having a value at that time of three million nine hundred eighty one thousand two hundred sixty seven dollars ($3,981,267).[9] Under the escrow agreement, Union Planters was to monitor the value of stock weekly and notify the City, County, and PMA should the value of the stock fall below three million three hundred thousand dollars ($3,300,000.00) or one hundred ten percent (110%) of the required reserved fund, in which event PMA had an obligation to replace the deficiency.

A short time before the execution of the City and County Agreement, Hard Rock Memphis' interest in the leased premises was conveyed to POA with the consent of the City and County, by virtue of an Assignment, dated March 28, 1989.[10] Even though the ownership of each company differs somewhat, POA and PMA have an identical management structure: Sidney Shlenker, as President and Chief Executive Officer, Marshall Criss as Chief Administrative Officer, and Walter Richards as Chief Financial Officer. POA and PMA, and the other related entities, were often referred to collectively as "the Pyramid Companies."

Soon after execution of the Management Agreement, PMA contacted MSU about managing MSU's interests in the Pyramid. An agreement was executed between PMA, MSU and TBR, and was effective August

---

**8.** Trial Ex. 15.

**9.** It is unclear how the initial value of the securities was determined for the purpose of satisfying the escrow agreement.

**10.** See Trial Ex. 10.

3, 1990 (the "MSU Agreement").[11] In return for an annual fixed payment from PMA, this agreement extended PMA's operational control at the Pyramid to include the management of MSU's interests for a five-year term with options to renew for additional terms.

A major element in the MSU Agreement centered on the skyboxes. Under this agreement, PMA assumed responsibility for furnishing the eleven (11) skyboxes which MSU had the responsibility to furnish under the Finance and Use Agreement. PMA was given the right to retain all revenues from the rental of skyboxes in which MSU had an interest, in effect giving PMA control over most of the skyboxes.

Pursuant to this agreement, MSU would also make available two million two hundred thousand dollars ($2,200,000) to PMA for certain capital improvements at the Pyramid, including the furnishing of skyboxes, athletic flooring, scoreboards, video screens and similar fixtures and equipment. In the event of a default by PMA and termination of the agreement, PMA agreed to pay MSU one hundred fifty eight thousand dollars ($158,000) per year up to the amount of any disbursements by MSU of the two million two hundred thousand dollars ($2,200,000). This obligation by PMA was to be secured during the initial five (5) year period by the proceeds from the rental of the non-MSU skyboxes for that period. Additional security was to be provided by PMA for disbursements by MSU exceeding seven hundred ninety thousand dollars ($790,000). In effect, PMA was only entitled to seven hundred ninety thousand dollars ($790,000) of the two million two hundred thousand dollars ($2,200,000) from MSU without providing additional security, such as the pledge of non-MSU skybox rentals for additional five (5) year periods or security "as otherwise acceptable to Board of Regents and MSU." See Trial Ex. 25.

Provisions were also included in the MSU Agreement that related to the rights of the parties regarding the sale of advertising, private club memberships, non-food conces-sions, parking, public broadcast fees, and other operational items. Finally, pursuant to paragraph 5(d), the agreement provided that "... this Agreement shall terminate, effective immediately thereupon, if and when the PMA Agreement should *effectively terminate.*" (Emphasis added).

Even though PMA pledged the revenues from non-MSU skyboxes to secure the repayment of at least seven hundred ninety thousand dollars ($790,000) in capital disbursements by MSU in the event of PMA's default, PMA had already pledged these skybox revenues to National Bank of Commerce ("NBC") as security for a loan several months prior to the execution of the MSU Agreement. During this period, PMA also entered into several skybox leases, receiving payments therefrom, giving the leaseholder the right to use a box during "all public events" including MSU events, prior to being given authority to do so for MSU events by the MSU Agreement. Criss testified that PMA took these actions with MSU's knowledge and consent. John Cothern, the principal negotiator on behalf of MSU, testified however, that he was unaware of either circumstance during the negotiations with PMA.

As demonstrated by the testimony of Bennett, PBA's field representative on the project, there was difficulty throughout the construction of the Pyramid in coordinating the planned activities of POA and PMA in the Pyramid with the construction schedule of the contractor. Bennett observed that since these firms were to be the principal users of the facility, the most efficient procedure would have been to have the design elements required for their use in place as each stage of construction progressed. For example, the needs of POA and PMA would impact the design of food concession areas; the stage "rigging grid"; the foundations and trusses supporting the inclinator ride to the observation deck; the heating, ventilating, and air conditioning (HVAC) system; the electrical system; the computer management system to monitor the HVAC and electrical systems; and the

---

**11.** See Trial Ex. 25.

skybox finishes. Construction progress reports issued by Bennett from August 1989 through April 1991 are replete with references to items requiring action or decisions by PMA and POA.

In early 1991, the City and County officials became concerned that PMA would not be in a position to open the Pyramid for events in a timely fashion after construction of the structure was completed. The opening of the Pyramid had initially been planned for either late spring or early summer, 1991; but by May of that year, the *projected opening date had been extended to November, 1991.*

A major concern was whether PMA could provide the furnishings and equipment necessary to have the arena available for the opening of the MSU basketball season in November, 1991. Timing was critical insofar as season ticket sales and related activities had to be planned and undertaken by MSU several months in advance of the opening of the season.

Under the Management Agreement, PMA was to install a wide variety of furniture, fixtures and equipment in the playing area, concession areas, skyboxes, and dressing rooms required for the Pyramid to host basketball events. In a letter to the City and County dated May 16, 1991, PMA estimated the "total cost of the items we feel are necessary to open and operate the arena in a first class manner to be $8,428,-491." Among the funding sources cited in this letter was "$1,965,063 from MSU." However, PMA admittedly had never provided MSU with the additional security required to draw more than seven hundred ninety thousand dollars ($790,000) from MSU for such improvements. PMA's letter stated that it would be necessary for the City and County to promptly approve using certain skybox rentals as security to MSU in order to secure "the balance of the MSU $2,200,000." This statement was made by PMA despite having been told some ten (10) days before in a meeting with representatives of the City and County that such approval would not be forthcoming

and having been previously assured by MSU that other security would be acceptable.

PMA's May 16, 1991 letter also cites PMA as the source of four million five hundred sixty three thousand four hundred twenty eight dollars ($4,563,428), or more than half of the total outlay required to have the arena open by the fall. PMA repeatedly asserted that the financing required to provide such an amount was imminent. On one occasion, PMA displayed a letter to the City and County officials purportedly committing eighty million dollars ($80,000,000) to the project, based on a permanent loan commitment from Teachers Insurance and Annuity Association of America ("Teachers").[12] However, debtors were subsequently unable to get a construction loan commitment. As a result, construction funds and operating capital came from Shlenker, Tigrett, sponsors, concessionaires, and loans. As late as June, 1991, PMA still had not obtained the required financing for the project.

Another major source of concern to City and County officials during this period was maintenance of the required reserve fund in escrow by PMA. In September 1990 the parties to the escrow agreement executed an amendment whereby certain corporate stock held in escrow by Union Planters was given a fixed value for purposes of determining the escrow amount for a "fixed valuation period."[13] Under the amendment, it was agreed that PMA would replace these shares prior to the termination of the fixed valuation period with cash, letter of credit, or other securities of a type which could be valued more easily. A second amendment dated January 10, 1991, was executed whereby PMA was allowed to reduce the shares of the stock in question held by Union Planters. The fixed value of the remaining shares in the escrow was increased, and the fixed valuation date was extended until April 1, 1991. The City and County agreed to release part of the stock in order to give PMA some much needed operating capital. However, Criss

---

**12.** See Trial Ex. 31.

**13.** See Trial Ex. 38.

testified that Union Planters released the stock to the debtors in care of Dean Bonham, supposedly an agent of the Pyramid Companies, who delivered the stock to John Tigrett. The debtors never received the benefit of the release.[14]

By mid-February 1991, officials of the City and County were aware that there was dissension among the principals of PMA. In March, the City and County were concerned enough about the entire situation to prepare a list of "existing defaults/anticipated defaults" by the Pyramid Companies which representatives of the City and County discussed personally with the two principals. See Trial Ex. 43.

A meeting was held among the City, County, and the Pyramid Companies on April 12, 1991, at which time the companies presented information relative to the status of the project. Over the next several days, City and County officials studied the information provided by the Pyramid Companies at that meeting. Since the Pyramid Companies had not obtained financing and were not meeting dates on their own schedules, the City and County reached a decision that further action would be required to get the building open on a timely basis.

By letters dated April 16, 1991, the City and County issued two separate default notices to PMA relating to PMA's failure to perform under its Management Agreement and Escrow Agreement with the City and County.[15] One notice declared PMA to be in default of seven sections of the Management Agreement dealing with a variety of responsibilities required of PMA, including the provision of the furniture, fixtures, and equipment necessary to make the Pyramid arena functional for public events. A separate notice stated that PMA had previously been notified by Union Planters that the fixed valuation period under the Escrow Agreement had expired without replacement of the corporate stock in question and that "there was a deficit in the escrow of two million seven hundred seventy one thousand forty seven dollars and twelve cents ($2,771,047.12) in marketable securities or two million five hundred nineteen thousand one hundred thirteen dollars and seventy-five cents ($2,519,-113.75) in cash or equivalents." Trial Ex. 49. The notice further declared PMA's failure to correct this deficiency to be an event of default under the Management Agreement. Both notices made references to the thirty (30) day cure period provided in the Management Agreement.

PMA and the City and County thereafter met on numerous occasions relative to these default notices. During these meetings, PMA officials allegedly acknowledged the existence of defaults, but represented that financing was imminent and maintained that they were attempting to cure the defaults. The thirty (30) day deadline was extended by the City and County on several occasions to give PMA time to deliver on promised actions.[16]

PMA did not cure the defaults contained in the prior notices. By letter to PMA dated June 17, 1991, the City and County informed PMA that the Management Agreement with PMA was being terminated by the City and County as of that date. A copy of this letter was subsequently sent to MSU. Based upon the City and Coun-

---

**14.** It is observed that litigation is pending in state court regarding the escrow release and other matters involving rights and obligations under the Escrow Agreement.

**15.** Trial Exs. 49 and 51.

**16.** By letter, dated April 3, 1991, PMA was given notice by Union Planters of a deficiency in the Reserve Fund escrow account resulting form PMA's failure to replace the GOI stock on April 1, 1991. Ex. 92. PMA was given ten (10) days to cure the deficiency. Trial Ex. 92; Ex. 15 ¶ (1)(c) at 2. When the deficiency was not timely cured, the City and County issued a default notice on April 16, 1991, advising PMA that it had thirty (30) days to cure this default under the Management Agreement. Trial Ex. 49.

On May 16, 1991, the last day of the cure period, PMA suggested a Financial Guarantee Bond for three million dollars ($3,000,000) from American Contractor's Surety, Inc. to City and County as a solution to the escrow default. Trial Ex. 96; Criss at 438–439; Morris at 986; Kuhn at 1236 and 1253; Shlenker at 1702–1703. Upon investigation, it was determined that American Contractor's Surety, Inc. was not licensed to do business in Tennessee. Criss at 438–439; Morris at 986–987; Kuhn at 1236, 1253; Shlenker at 1704.

ty's action, MSU sent a letter dated June 26, 1991, to PMA stating that the MSU Agreement had terminated effective June 17, 1991, citing the automatic termination provision of the MSU Agreement.

The City and County thereafter proceeded to make arrangements for the completion of the Pyramid arena by November, 1991. The City and County and MSU negotiated an agreement whereby MSU would contribute three million dollars ($3,000,000) to be used for improvements required in the Pyramid arena for it to open. MSU received additional consideration, such as a share of the concession revenues from the City and County, in return for this additional capital contribution. The City and County either assumed or renegotiated the sponsorship agreements with the sponsors who were then in place as a result of debtors' efforts. Under certain of the renegotiated agreements, some of the sponsors provided funding to complete the concession areas.

The section 362(a) automatic stay was consensually modified to allow Leisure Management, Inc. ("LMI") to operate the arena without prejudice to the debtors' rights, during the pendency and awaiting the outcome of these motions.

## DISCUSSION

1. *Assumption of Leases and Executory Contracts under 11 U.S.C. § 365*

■ In accordance with 11 U.S.C. § 365, the trustee or debtor-in-possession may assume or reject an executory contract or unexpired lease of the debtor to the extent that such constitutes property of the estate. *See Arizona Appetito's Stores, Inc. v. Paradise Village Inv. Co. (In re Arizona Appetito's Stores)*, 893 F.2d 216, 218 (9th Cir.1990). Under 11 U.S.C. § 365(c)(3), the trustee or debtor-in-possession, however, "may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties,

if ... such lease is of nonresidential real property and had been terminated under applicable nonbankruptcy law prior to the order for relief." It is well established that an agreement or contract which is validly terminated prepetition under applicable state law is not assumable under section 365(a). *In re Memphis–Friday's Associates*, 88 B.R. 830 (W.D.Tenn.1988). *In re GISC, Inc.*, 130 B.R. 346, 348 (Bankr. M.D.Fla.1991); *see also In re Metro Air Northeast, Inc.*, 131 B.R. 555, 556 (Bankr. W.D.N.Y.1991) (stating that in order for a debtor to be able to assume a lease, that lease must be in existence on the date the bankruptcy petition was filed); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1212–13 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (filing of chapter 11 petition can not resuscitate rights under a contract which was validly terminated prepetition). The termination process, on the other hand, *must be complete and not subject to reversal*, either pursuant to the terms of the contract or under state law, including anti-forfeiture statutes or waiver doctrines. *See Moody*, 734 F.2d at 1212; *Memphis–Friday's*, 88 B.R. at 840.

■ Moreover, a contract that has been breached by a debtor, or where the debtor has defaulted in performance, is assumable, with court approval, provided the debtor complies with the conditions laid out in 11 U.S.C. § 365(b)(1). *In re RLR Celestial Homes, Inc.*, 108 B.R. 36, 45 (Bankr. S.D.N.Y.1989). Likewise, a contract is not necessarily deemed terminated and nonexecutory merely because the debtor has defaulted or breached the contract before the commencement of the case. *Id.*[17] To be effective and dispositive on the issue of termination, such breach or breaches must be material going therefore to the essence of the contract. Otherwise, these breaches would be merely technical and thereby suitable for equitable relief. *In re Masterworks, Inc.*, 94 B.R. 262, 265 (Bankr. D.Conn.1988).

---

**17.** In fact, section 365(b)(1), arguably, contemplates that most debtors would have breached some executory contracts prepetition and thereby exercise their options under this section. *Id.*

Otherwise, the express authorization for curing defaults as expressed in section 365(b)(1) would be rendered superfluous. *Id.*

■ The ultimate burden of production and persuasion falls upon the debtor who must show that the contract or lease was not terminated or terminated effectively prepetition under applicable state law. *See id.* See also, *Memphis–Friday's Assocs.*, supra. However, the objecting parties in this case, the City, County, and MSU, have the initial burden of showing defaults in the executory contracts or leases and that those defaults have been properly noticed. *In re Rachels Indus., Inc.*, 109 B.R. 797, 802 (Bankr.W.D.Tenn.1990). The parties must meet their respective burdens by a preponderance of the evidence. *Grogan v. Garner*, —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ Regarding the issue of whether the agreements were effectively terminated prior to the order for relief, this Court must look to Tennessee law. *Id.* at 803–04. Provided that their terms are not otherwise illegal, Tennessee law unequivocally gives effect to agreements, including leases, as written. *Id.* at 804; *see e.g.*, *St. Paul Surplus Lines v. Bishops Gate Ins. Co.*, 725 S.W.2d 948, 951 (Tenn.App.1986); Tenn.Code Ann. § 47–50–112(a) [18]. In construing contracts, the intention of the parties as ascertained from the language of the instrument controls. *Id.* (quoting *St. Paul Surplus Lines*, 725 S.W.2d at 951). The parties' intention can also be determined from the subject matter to which the agreement refers, from the circumstances of the particular transaction and from the constructions placed on the agreement by the parties in carrying out its terms. *Penske Truck Leasing Co., L.P. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn.1990). Words expressing the parties' intention should be given their usual, natural, and ordinary meaning. *Id.*; *Rachels*, 109 B.R. at 811. Such unconstrained construction leaves the parties in the position for which they bargained. *Rachels*, 109 B.R. at 811. Moreover, the court must examine *all* relevant agreements or leases, including those

that might have been incorporated. *See Rachels*, 109 B.R. at 804. If an agreement requires performance of a collateral agreement, either referred to or incorporated into the agreement, the failure to perform under the related agreement may constitute a default of the agreement. *Id.*

### 2. *Relevant Case Law on Termination*

The seminal case on the termination issue is *Memphis–Friday's*, 88 B.R. at 831. The chapter 11 debtor in *Memphis–Friday's* sought to assume a commercial lease on property which housed its restaurant establishment and to obtain ultimate possession of the same. Primarily at issue in that case was whether the lease in question had been effectively terminated under state law prior to the entry of the order for relief. *Id.*

The lease agreement gave the landlord the right to terminate in the event of a default after providing the debtor an opportunity to cure within the specified period as denoted in the lease. *Id.* at 832. The debtor undertook renovations without first satisfying the lease requirements that it obtain the landlord's permission. *Id.* Contrary to the lease, the debtor neglected to provide the landlord with the specifications for the work to be done and to submit to the landlord performance, labor and material payment bonds or financial statements exhibiting a sufficient net worth of the debtor. *Id.* In response to the debtor's failure to pay the contractor performing the restaurant renovations, a materialmen's lien was taken against the premises; these liens also contravened the lease. *Id.* The debtor, in addition, had failed to meet its tax obligations with the Tennessee Department of Employment Security. The Department therefore placed a lien against the debtor's property at the premises. *Id.* The debtor also fell into arrears in its rental payments. *Id.* The debtor, prior to the filing of its petition, had received written

---

18. Section 47–50–112(a) reads, in relevant part, as follows:

All contracts, including, but not limited to, notes, security agreements, deeds of trust and installment sales contracts, in writing and signed by the party to be bound, including endorsements thereon, shall be prima facie evidence that the contract contains the true intention of the parties, and shall be enforced as written.

notices of default both from its lessor and franchisor under the provisions of the respective agreements. *Id.* at 832.

Despite the above events, the debtor, nonetheless, argued that the lease had not been properly terminated under Tennessee law as termination required actual re-entry by the landlord, commencement of a suit for possession, or issuance of a writ of possession. *Id.* at 836. The court determined, however, that the debtor, in advancing its argument, erroneously relied upon cases dealing with residential rather than commercial real estate. *Id.* Some of the debtor's cited cases involved the determination as to when a debtor's leasehold or freehold interest in residential real estate is expired or forfeited rather than terminated. *Id.* While other cases involved leases with language equating default with expiration or termination, the debtor's lease provided for specific notice and a reasonable cure period preceding termination. *Id.* Thus, the court concluded that the lease was terminated prior to the order for relief; there remained no lease available for assumption under 11 U.S.C. § 365(c)(3). *Id.* at 840. *Memphis–Friday's* may be distinguished from the case at bar *sub judice.* The lease in *Memphis–Friday's* contained no good faith dispute provision as did the PMA Management Agreement.

The Seventh Circuit Court of Appeals in *Moody,* in relevant part, announces the proposition that "termination must be complete and not subject to reversal, either under the terms of the contract or under state law." *Id.* at 1212. The debtors had entered into retail petroleum dealership contracts or lease agreements with Amoco as the supplier and the franchisor. *Id.* at 1204. The lease agreements provided that Amoco could terminate the lease agreements in the event of any convincing evidence of the financial distress of the debtors, for example the giving of one or more insufficient funds checks which remained dishonored after five days from the postmark of Amoco's notice to cure the dishonor. *Id.* at 1206. The debtors failed to cure within this five (5) day period and subse-

quently filed their chapter 11 petition during the ninety days (90) in which Amoco's termination of the lease became effective. *Id.*

The termination notices of the debtors' dealership lease were deemed effective prior to their bankruptcy filing. *Id.* The *Moody* court so determined despite the debtors' contentions, in pertinent part, that: (1) the dealership leases were assumable because the agreements had not been properly and timely terminated; (2) even if the agreements were terminated, they may be assumed pursuant to 11 U.S.C. § 365 as that section permits revival of a terminated contract; and (3) because their chapter 11 petition was filed before the expiration of this ninety-day period, their dealership contracts were still executory and assumable under section 365. *Id.* at 1207. In so determining, the *Moody* court adopted the argument of the appellee, Amoco, that "[a]fter the termination notices were sent, all that remained under the contracts was the passage of time until the terminations were complete" and "that when the debtors filed, there was noting left to assume under the contract except the remaining time—ninety days—before the contract was terminated completely." *Id.* Therefore, the contracts gave the debtors no right to cure once the termination notices were posted. *Id.* Thus, the court concluded that as termination was automatically effective at the expiration of the ninety (90) days; no further action by Amoco was necessary to terminate the contracts. *Id.*

In addition, no right to cure was available under applicable state (Wisconsin) law. *Id.* More important, the debtors' filing of their bankruptcy petitions before the expiration of the ninety day (90) period did not work to alter the fact that termination of the contracts occurred prepetition. *Id.* at 1213. When the termination notices had been posted, the debtors merely had a right to only ninety days' worth of dealership contracts; therefore, the filing of the petition did not otherwise expand the debtor's rights under the contracts. *Id.*[19]

---

19. The *Moody v. Amoco Oil Co.,* 734 F.2d 1200 (7th Cir.1984) court cited 11 U.S.C. § 541(a) for

The court in *In re Metro Air Northeast, Inc. (N.Y.)*, 131 B.R. 555, 556 (Bankr. W.D.N.Y.1991), resolved that the leases had been terminated prepetition and therefore could not be assumed by the debtor. The debtor in *Metro* had leased from the City of Burlington a parcel of real property. *Id.* at 555. The debtor failed to pay rent and was therefore in default pursuant to the provisions of the lease it had executed with the City. *Id.* The City sent the debtor a letter stating that it was in default and that it would have thirty (30) days in which to cure the arrears and avoid termination. *Id.* The debtor failed to cure the arrears within the thirty-day period and subsequently filed for chapter 11 relief. *Id.* at 555–56.

In so resolving, the *Metro* court found that the City had sent a termination notice which was in accordance with the requirements as outlined in the lease. *Id.* at 556. The court also found that the debtor did not cure its defaults within the requisite period as required by the lease and as stated in the notice of default. *Id.* Consequently, the court denied the debtor's motion to assume the lease. *Id.*

The Bankruptcy Court in *In re Masterworks, Inc.*, 100 B.R. 149, 150 (Bankr. D.Conn.1989), construed a franchise agreement whereby the franchisor was given the right to terminate the agreement for cause [20] and upon notice to the debtor if the debtor failed to make the required payments and to cure within the notice period. *Id.* at 150. The debtor did not make the royalty payments as required over a two-month period; and, by letter, the franchisor gave the debtor sixty (60) days notice of its intention to terminate. *Id.* The debtor filed its chapter 11 petition before the expiration of the sixty (60) days. *Id.*

In *Masterworks*, the franchisor contended that the subject agreement was nonexe-cutory at the commencement of the debtor's case because all that remained to complete the termination was the passage of time and that the agreement had therefore been effectively terminated. *Id.* at 151. The court rejected this contention on the ground that the authorities upon which the franchisor had relied were distinguishable as the debtor in those cases had no right to cure under the contract or the applicable law when the petition was filed. *Id.* The court therefore found that the debtor's right to cure had not lapsed when the petition was filed and that the agreement was still executory. *Id.*

The court next considered the debtor's right to cure postpetition. *Id.* It concluded that 11 U.S.C. § 365(d)(2), instead of the sixty days imposed by section 108(b), governed and thereby extended the statutory cure period (as opposed to the contractual cure period) to any time prior to confirmation of the plan. *Id.* 151–52; *Memphis–Friday's*, 88 B.R. at 839–40. Accordingly, the *Masterworks* court held that "the intervention of bankruptcy within the statutory cure period preserved the executory nature of the [a]greement notwithstanding the [franchisor's] prepetition notice of termination." *Id.* at 152.

*Propriety of Notice*

On this issue, courts have distinguished cases in which the agreements themselves do not provide the right to cure upon tendering of notice and those which do. *In re Masterworks, Inc.*, 100 B.R. 149, 151 (Bankr.D.Conn.1989). Courts have held that where termination notices do not embody or contemplate cure provisions, those terminations are effective upon the expiration of the stated period. *Moody*, 734 F.2d at 1212; *see also, In re Gateway Investors, Ltd.*, 113 B.R. 564, 570 (Bankr.D.N.D.1990) (when lease agreements have been validly

---

the conclusion that this section was not intended to enlarge the debtors' rights against others more than what was in existence at the commencement of the case; such rights continue only to the extent that they were a property interest of the debtor prepetition. *Id.* Similarly, 11 U.S.C. § 362 does not work to "toll the mere running of time under a contract, and thus [this section] does not prevent automatic

termination of the contract." *Id.* The debtors, under this section, would not be given greater rights in a contract. *Id.*

**20.** "Cause" was defined in the agreement as a material breach of the franchise agreement or of any other contract or agreement between the franchisor and the debtor. *Id.* n. 3.

terminated prepetition they cease to be assumable under section 365). Courts have also held that such notices merely evidence an intent to terminate rather than an actual termination. *In re Independent Management Associates, Inc.,* 108 B.R. 456, 462 (Bankr.D.N.J.1989). What remains dispositive is whether the debtor's right to cure had lapsed prepetition and had thereby become nonexecutory. *Id.* None of these cases, however, consider the propriety of notice; that is, whether notice followed a valid determination that an actual and unequivocal default occurred pursuant to the terms and provisions of the parties' agreement as construed.

*Incorporation and Integration*

In the context of these contested proceedings, the Court is dealing primarily with four contracts: The Hard Rock Lease Agreement ("POA Operating Agreement" or "Hard Rock Lease") executed June 27, 1988; (amended March 28, 1989); The Management Agreement for Memphis Pyramid Arena ("Management Agreement" or "Arena Agreement"), executed April 14, 1989; the Escrow Agreement, executed July 14, 1989;[21] and the Memphis State University/PMA Agreement ("MSU Agreement"), executed August 3, 1990.[22] The debtors contend that the contracts are integrated and should be construed in *pari materia,* however the City and County aver that the contracts are not incorporated one within the other.

■ A written contract is presumed to contain the entire agreement by the parties. *Weeks v. Dealers' Implement Co., Inc.,* 16 Tenn.App. 599, 65 S.W.2d 585, 586 (Ct.App.1933). Whether a contract is entire or divisible into several independent contracts, permitting several actions thereon, depends upon the intention of the parties to be ascertained from the language

employed and the subject matter of the contract. *Barnes v. Black Diamond Coal Co,* 101 Tenn. 354, 47 S.W. 498 (1898); *Brockett v. Pipkin,* 25 Tenn.App. 1, 149 S.W.2d 478, 492 (Ct.App.1940). In the absence of fraud or mistake, a contract must be interpreted and enforced as it is written, even though it contains terms which may be thought harsh and unjust. *Ballard v. North American Life & Cas. Co.,* 667 S.W.2d 79, 82 (Tenn.Ct.App.1983); *Swanson v. Mid–South Title Ins. Corp.,* 692 S.W.2d 415, 419 (Tenn.Ct.App.1984); *Taylor v. White Stores, Inc.,* 707 S.W.2d 514, 516 (Tenn.Ct.App.1985); *St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins.,* 725 S.W.2d at 951; 88 B.R. at 834; *Humphries v. West End Terrace, Inc.,* 795 S.W.2d 128, 133 (Tenn.Ct.App.1990); *Rapp Constr. Co. v. Jay Realty Co.,* 809 S.W.2d 490, 491 (Tenn.Ct.App.1991).

■ As a matter of law, courts interpret unambiguous instruments as they are clearly written. *Federal Deposit Ins. Corp. v. Armstrong,* 784 F.2d 741, 744 (6th Cir.1986); *In re Estate or Espey,* 729 S.W.2d 99, 101 (Tenn.Ct.App.1986). If the contract is ambiguous or silent on its face, however, the intention of the parties must be gathered from the whole instrument taken in connection with the surrounding circumstances. *Greyhound Lines, Inc. v. Sharpe,* 565 F.Supp. 419, 421 (E.D.Tenn. 1983). Courts are precluded from creating a new contract for the parties. *Galyon v. First Tennessee Bank Nat. Ass'n,* 803 S.W.2d 218, 219 (Tenn.1991). Tennessee courts will not rewrite contracts just because they are ill advised or the parties miscalculated future events. *Wilson v. Scott,* 672 S.W.2d 782, 786 (Tenn.Ct.App. 1984). Nor may the Court make new contracts for the parties under the guise of

---

**21.** This Court considers the Escrow Agreement for the limited purpose of determining whether a default under the Escrow Agreement constituted an event of default under the operating agreement and/or the Management Agreement. This Court has exercised abstention to allow the state court to determine issues related to rights and interests of the parties under the Escrow Agreement. See 28 U.S.C. § 1334(c).

**22.** For purposes of the integration/incorporation argument, analysis of the MSU Agreement is not relevant since there is no contention that the MSU Agreement was either incorporated into the other contracts, or that they were incorporated into the MSU Agreement. However, there is no dispute that the MSU Agreement was expressly tied to the Management Agreement for performance and termination.

unwarranted interpretations. *Rogers v. First Tennessee Bank Nat. Ass'n.*, 738 S.W.2d 635, 632 (Tenn.Ct.App.1987). Notwithstanding, under Tennessee law, contract terms may be implied in appropriate cases and under appropriate circumstances *Bailey v. Chattem, Inc.*, 684 F.2d 386, 396 (6th Cir.1982).

Under the facts and circumstances of this case, the Court observes that the four (4) agreements were executed at four (4) different and distinct periods in time, with almost a year lapsing between execution of the Hard Rock Agreement and the Management Agreement. The Hard Rock Lease specifically recites at section 22.7 that it is the *entire agreement* of the parties. It recites, to wit:

*Section 22.7. Entire Understanding.* This lease agreement contains the entire agreement between Lessor and Lessee and no agreement, representation or attempt to modify this lease agreement, whether by course of conduct, or an informally written agreement shall prevail unless formally set forth in writing, signed by Lessor and Lessee, indicating that such writing is an amendment or modification to this lease agreement.

Similarly, section 12.02 of the Management Agreement required "written consent of the parties" in order to amend the Agreement. Likewise, by its terms, the parties deemed the agreement as written to be the entire agreement of the parties. See Management Agreement section 12.09, Trial Ex. 12.

Nowhere in the body of the Management Agreement does it seek to incorporate the Hard Rock Lease Agreement or seek to integrate its items. However, the Management Agreement does refer to the Hard Rock Lease Agreement in the "recitals provisions." [23] Additionally, at section 12.15, the Management Agreement defines the limited purpose for which POA executed the Hard Rock Lease Agreement, that is, to acknowledge its obligation to pay certain fees. [24]

On the other hand, the Escrow Agreement contains purported incorporation language in its recitals relative to the Management Agreement. Specifically, the Escrow Agreement states:

**WHEREAS,** as of April 14, 1989, Lessee and Manager entered into a *Management Agreement (the "Agreement"), a copy of which* is *attached hereto as Exhibit "A" and made a part hereof, relative* to the management and operation of the "Public Facility," as such term is defined in said Agreement. (emphasis added).

Thus, the Court finds that inasmuch as the Hard Rock Lease was in existence at the time the Management Agreement was executed and both (Hard Rock and Management) were in existence at the time of the Escrow Agreement, the omission of such incorporation language expresses the intent of the parties not to incorporate the HRC Agreement into the Management Agreement. Conversely, it may be argued that the parties intended to incorporate the provisions of the Arena Agreement into the Escrow Agreement. Notwithstanding, the Court must determine whether the attempted incorporation was effective under applicable law.

Thus, the Court addresses the integration of the contracts and their

**23.** [*WHEREAS,* pursuant to the terms of that certain Memorandum of Agreement, dated as of June 27, 1988, the Public Building Authority of Memphis and Shelby County, Tennessee (hereinafter, "Owner") is developing and constructing a public facility capable of supporting notable public events including athletic, educational and entertainment activities, located on property situated in the City of Memphis, Shelby County, Tennessee, and owned by the Owner, and as more particularly described at Exhibit "A" attached hereto and made a part hereof (the "Project"); and,

*WHEREAS,* pursuant to that certain Master Lease Agreement and Assignment, dated as of June 27, 1988, the Owner has leased the project to Lessee[;].

**24. 12.15 Execution by POA.** POA hereby enters into this Agreement for the sole purpose of acknowledging its obligation to pay Lessee the fee specified in Section 7.03, as required, and to share its sponsorship revenues with Lessee to the extent contemplated in Section 7.04, in consideration of its right to receive the sponsorship revenues specified in Section 7.04 in reduction of its pre-paid rent.

814

terms. It is a fundamental rule of contract construction that the entire contract, and each and all of its parts and provisions, including the signatures, must be given meaning, and force and effect, if that can consistently and reasonably be done. *Burdon Cent Sugar Refining Co. v. Payne,* 167 U.S. 127, 17 S.Ct. 754, 42 L.Ed. 105 (1897). An interpretation which gives reasonable meaning to all of its provisions will be preferred to one which leaves a portion of the writing useless, meaningless, or inexplicable. *Id.*

Generally, absent evidence to the contrary, instruments executed contemporaneously with commonality of parties, purpose, and transaction will be construed together in the eyes of the law as one contract. *Joy v. City of St. Louis,* 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843 (1891). Construing contemporaneous instruments together simply means that if there are any provisions of one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect as between the parties; and others charged with notice, so that the intent of the parties may be carried out. 17A Am.Jur., Contracts § 388 (Citations omitted). In the instant case, the PMA–POA/the City and County's contracts were a part of a series of transactions with commonality of parties and purposes, but with different execution dates. The contracts generally referred to each other in various sections.[25] For example, the Management Agreement refers to the Hard Rock Lease and "contemplates" the Escrow Agreement. Moreover, the recitals of the Escrow Agreement, refer to the Management Agreement and seek to incorporate it.

Since recitals indicate only the background of a contract, that is, the purposes and motives of the parties, they do not ordinarily form any part of the real agreement. Generally, recitals are more aspirational, and they do not have the force of contractual stipulations. Recitals, however, may have a material influence in construing the contract and determining the intent of the parties, and in such respect they should, so far as possible, be reconciled with the operative clauses and be given effect. 17A Am.Jur.2d Contracts § 392 (citations omitted). Tennessee has addressed this issue in *Harrell v. Dean Food Co.,* 619 S.W.2d 528 (Tenn.App.1981), where the Court looked at the language in the recitals of two fully executed agreements which the appellee urged be construed together as one. The Appellate Court rejected appellee's argument and held:

> Where the dairy products company drafted the "distributor agreement" and "sale and option agreement" by virtue of which distributor agreed to sell products in specific territory, those two documents would not be construed together so as to allow the dairy products company to terminate the distributor upon 30 days notice, since, had the dairy products company desired that both be considered one contract, it had only to say so or draw one instrument.

*Id.* at 529.

Based on all the foregoing, the Court finds and holds that the contracts were related, but each contract constituted a separate and fully integrated agreement. The incorporation language in the recitals of the Escrow Agreement, based on Tennessee Law, is insufficient to work an incorporation of the Management Agreement.[26] See *Harrell v. Dean,* supra. Nonetheless, the Agreements may be considered together to give effect to the intention of the parties without wholesalely importing the terms and conditions from one to the other.

*Purported Defaults Under Management Agreement*

A. PMA purportedly failed to perform various sections of the Management Agreement. In resolving whether the alleged defaults cited by the City and County in their April 16, 1991, "Notice of Default" are material, this Court will review the

---

25. See § 12.15 of Management Agreement and the first "whereas" clause of the Escrow Agreement.

26. The Court will elaborate more fully on this issue, *infra.*

following provisions cited as their bases for default:

1. Article 3, section 3.01(i), (j), (*o*), (p), and (q).
2. Article 3, section 3.02(b), (e), (f), (i), (j), and (*o*).
3. Article 3, section 3.05(b), items 1 through 16.
4. Article 3, section 3.06.
5. Article 4, section 4.06.
6. Article 4, section 4.07.
7. Article 8, section 8.02.

■ Although the notice issued by the City and County complied with the requisite mechanical formalities as directed under Article 12 of the Management Agreement, this Court finds that the mere dispensing of notice, in and of itself, cannot constitute an effective termination under the Management Agreement. What needs to be provided is a blueprint so that the debtor can initiate its efforts to cure. The Management Agreement fails to include a mechanism to declare a party in default and a unilateral declaration declaring a default does not suffice. The Court therefore must determine the propriety of the City and County's allegation that "the terms are either in default now or in the anticipatory breach of contractual default because you cannot meet them by the appropriate deadlines." The Court will treat these seriatim by Article.

*Responsibilities of the Manager, Article 3.*

■ Article 3.01 required the manager to, inter alia, (1) design and implement a Public Facility Reporting System; (2) monitor compliance with construction budget for the project to keep lessee informed; (3) determine on-sight parking requirements and implement same within budget and coordinate with the City and County, relative to the usage of City and County owned offsite parking for Public Facility events; (4) develop a comprehensive marketing plan and brochure and implement "as soon thereafter as possible"; and (5) develop a comprehensive staffing plan.[27] The City and County contend that debtors defaulted

on these responsibilities and further that such events of default were *material* so as to constitute a material breach of the overall contract providing "just cause" for termination.

Debtors contend, in response to section 3.01(i) which required a "Public Facility reporting system", that debtors implemented an *internal* reporting system with respect to providing guidelines for staff reports to officers. See Criss at 294. First, in determining whether defaults took place, the Court recognizes that the term "regular reports" was not defined in the agreement. In support of the position that PMA failed to make regular reports, Brian Kuhn, Attorney for the County, stated that no reports, either oral or written, were submitted by PMA in compliance with the Management Agreement. PMA, on the other hand, consistently asserted through counsel and its representative(s), that sections 3.01 and 3.02 were complied with; thus, no defaults with respect to these provisions occurred. Indeed, much energy was exercised by both sides on the question of whether "regular reports" were made by the debtors.

■ Despite the time expended on this question, the parties failed to exhibit satisfactory evidence as to their exact intent regarding the meaning of the term, "regular reports", at the time of execution of the agreement. Because of this lack of satisfactory evidence in the record, the Court, under general rules of contract law, must justifiably adopt the plain meaning of the language the parties chose to embody the final expression their agreement. Thus, the words, "regular reports", must be accorded and assigned their reasonable, ordinary meaning and interpretation in the context in which they were used. *See Edwards v. Travelers Indemnity Co.*, 201 Tenn. 435, 300 S.W.2d 615, 617 (1957). In making this determination, the Court recognizes that parties have the right to make their own contract, and that it is not the function of a court to re-write it, or to give it a construction in conflict with the accepted and plain meaning of the language used.

27. Trial Ex. 12.

*See Memphis–Friday's Assocs.,* 88 B.R. at 834. *Hagarty v. William Akers, Jr. Co.,* 342 Pa. 236, 20 A.2d 317, 319 (1941). Further, it is recognized that the cardinal rule for interpretation of contract is to ascertain the intention of the parties and give effect to that intention consistent with legal principles. *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.,* 521 S.W.2d 578, 580 (Tenn.1975). Thus said, the Court must first address the generally accepted meaning of "regular" and "reports" within a business or commercial context.

Webster's defines "report" as:

1. A usually detailed account. 2. A formal account of the proceedings or transaction of a group.

Webster's defines "regular" as:

1. Customary, usual, or normal. 2. Orderly or symmetric. 3. Conforming to set procedure, principle, or discipline. 4. Methodically: well-ordered. 5. Happening at fixed intervals: periodic.

Black's Law Dictionary further defines "regular" as:

Conformable to law. Steady or uniform in course, practice, or occurrence; not subject to unexplained or irrational variation.

▅ Despite these exact definitions, it is characteristic of the English language that many words have varied meanings. *Snelling and Snelling, Inc. v. Parnell,* 59 Tenn.App. 258, 440 S.W.2d 23, 27 (1969). As a result, the intended meaning of a word or phrase frequently must be gathered from the context in which used. If the parties had a clear, mutual understanding of the intended meaning of a word, their mutual understanding must control. If not, the courts must presume that the intended meaning was that which appears reasonable when viewed in the light of the circumstances and context in which the word was used. Thus, in ascertaining the intention of the parties and what was within their contemplation, all of the surrounding circumstances must be considered. *See Fidelity Phenix Fire Ins. Co. of New York v. Jackson,* 181 Tenn. 453, 181 S.W.2d 625, 631 (1944); *Barretsville Bank & Trust Co. v. Bolton,* 182 Tenn. 364, 187 S.W.2d 306, 319 (1945). Such recourse to circumstances and context does no violence to the parol evidence rule. *Knoxville, C.G. & L.R. Co. v. Beeler,* 90 Tenn. 548, 18 S.W. 391 (1891); *see also Faulkner v. Ramsey,* 178 Tenn. 370, 158 S.W.2d 710, 711–12 (1942) (rule does not operate to exclude extrinsic evidence which aids, confirms or explains a writing). Parol evidence rule does not exclude evidence which tends to aid, confirm or explain writing rather than alter it or which assists the Court in understanding and interpreting the language of the writing. Utilizing these guidelines, the meaning of "regular reports" can be ascertained.

The means by which the debtors, including PMA, made regular reports from the agreement's inception was through meetings, telephone calls, letters and memoranda, whether oral or written, formal or informal. In addition, various promotional meetings, events and parties were held. In fact, the debtors and the City and County were in constant contact from the beginning of their joint partnership in 1988, when negotiations among the parties resulted in the Management Agreement being signed on April 14, 1989. See Trial Ex. 12. The extensive contact between the parties was clearly evidenced by the numerous documents admitted in to evidence throughout the trial and the testimony of most of those who were called to testify. For example, David Bennett, the project manager hired by Pickering, stated that the debtor companies were in constant contact with the Pickering Firm, the managing body that represented the interests of both the debtors and the City and County. Based on the plain meaning of the words "report" and "regular" and considering the totality of the surrounding circumstances in which they occurred, such meetings, telephone calls, letters and written reports come sufficiently within the plain meaning of "reports". Moreover, this finding is supported by the fact that the Management Agreement does not require that the reports be written. Further, given the frequency of the parties contacts, it clearly

appears PMA's reports were sufficiently "regular" and constant.

In observing the history of the parties' business relationship from 1989 forward, it appears that during the vast majority of the parties' contractual relationship, no complaints were communicated to PMA as to the lack of reports being made by PMA, or of any inadequacies as to PMA's reporting. Further, PMA's means of reporting did not vary significantly from 1989 to 1991. Reiterating the fact that the parties were in constant contact with one another and appeared readily amenable to any discussions concerning the project, it reasonably follows that under these circumstances, the City and County would have communicated their complaint at an earlier juncture in the parties' relationship.

Further, even if the City and County had voiced concerns to PMA as to the lack of and/or inadequacies of PMA's reporting, such "defaults" cannot be considered so material as to warrant a termination of the agreement as the City and County were indisputably kept informed. Had the reporting inadequacies been material, the reasonable and logical action would have been for the City and County to take some further type of direct action concerning the status of the agreement at the time the alleged non-compliance of PMA occurred, and not some two years later when trouble began to brew between the parties. While the City and County could maintain that the type of reporting by PMA should have changed in keeping with the stages of development of the project, this was not expressly stipulated in the contract, nor did the parties' conduct indicate the need for such adjustments.

■ Therefore, it is evident that from the inception of the Management Agreement the City and County was well aware of the means of reporting by PMA. Indicative of this is that in PMA's May 16, 1991 formal response to the Management Agreement Default Notice, Frank Watson, attorney for PMA, in addressing the defaults under section 3.01, represented that the requirements had been met through bi-weekly and monthly meetings. See Trial Ex. 69. Watson confirmed, on behalf of PMA, that PMA had no formal reporting systems when he stated: "In the event that you desire *formal reports* on all such matters *in the future*, we will be happy to implement a formal reporting procedure." See Trial Ex. 69, Ex. "A," ¶ 1 at 1. (Emphasis added). However, such an admission is not fatal. If the City and County initially intended the "regular reports" to have another meaning and effect, no conduct on the City and County's part indicated another intent until the parties relationship began to disintegrate in early 1991. The terms of an agreement are better shown by the parties' acts thereunder while harmonious and practical construction reflects their intention, than by inconsistent construction contended for when subsequent differences have compelled the parties to resort to law. *McDowell v. Rambo*, 21 Tenn.App. 448, 111 S.W.2d 892 (1937). As noted, had the complaint been communicated earlier or had PMA's means of reporting changed, then perhaps the City and County would have a stronger foundation upon which to assert this alleged default. However, the facts do not indicate either situation.

■ The practical interpretation given to the relevant contractual provisions by the parties while they were engaged in the performance of the contract, and before any controversy arose, is one of the best indications of the true intent of the parties with regard to these contract provisions. *See Spindler v. Kushner*, 284 So.2d 481, 484 (Fla.Dist.Ct.App.1973); *McDowell v. Rambo*, 111 S.W.2d at 899. Actions of the parties to the contract may be considered as indicating their interpretation of its meaning. *Id.* Thus, the Court finds that the City and County acquiesced in the type of reporting in which PMA engaged, because the City and County failed to adequately address concerns regarding PMA's duty to make "regular reports" at a more timely and thus more reasonable point in the parties' business venture.

In light of these circumstances, the Court finds that the City and County are essentially estopped to assert that PMA is

in default under the "regular reports" provisions of the Management Agreement. The City and County's failure to communicate its disfavor with PMA's "regular reports" at a more reasonable time, in essence, caused PMA to rely on the means by which the parties communicated, thus causing a change of position, or at least detrimental inaction, on the part of PMA in response to the conduct or expression, in this case lack of expression, on the part of the City and County.

The Court finds that the relevant contractual language is sufficiently vague, such that the debtors unrebutted testimony meets their burden. Moreover, the phrase "Public Facility reporting system" is not defined. Thus, again the Court must glean the intention of the parties, by giving the words their common usage in the industry. Because the term Public Facility is capitalized, the Court reasons that the word "public" characterizes the structure and does not attempt to define or describe the reporting system. Perhaps the language refers or attempts to bind the debtors to some industry standard; however, the City and County offered no proof to that effect. Thus, debtors met their threshold burden upon showing that an internal system of reporting had been established by the officers of the debtors. See Criss at 294.

*Purported Failure to Monitor Compliance with Construction Budget*

■ Did PMA breach the requirement to "monitor compliance with the construction budget", such as to create a material event of default under the Management Agreement?

While the City and County contend that the debtors failed to monitor compliance with construction budget in order to keep City and County informed, all parties have acknowledged the uniqueness of the Pyramid project and some of the inherent challenges of the design/build concept. The construction process was rather fluid. There were many changes, as evidenced by the many change orders processed.[28] Mayor Morris, Brian Kuhn, and David Bennett, each confirmed the testimony of Criss, that

there was constant, if not daily, communication between the City and County and the agents of debtors regarding various aspects of the project, including construction and finance. While there was no testimony that the debtors submitted full budgets during the required period, expense information was submitted. Through the conduct of the parties, and the City and County's silence, the City and County are now essentially estopped under equitable principles to claim that the debtors' actions constitute a material event of default such as to warrant a termination of the agreement.

Additionally, section 3.05 by its language would tend to limit the manager's responsibilities in that it provides "manager will not act as a construction manager for the project, ... and ... shall not be responsible for ... the compliance of the work with the plans and specifications for the Public Facility."

Thus, the Court finds that even assuming arguendo, an event of default occurred as to section 3.01(i), such event of default was not sufficiently material such as to provide "just cause" for termination under section 10.04, based on the conduct of the parties, as well as the language of section 3.05.

As to section 3.01(o), the Court is without sufficient information to determine whether there was actual compliance. The language is not capable of precise application or interpretation. However, due to debtors' June 17th ouster prior to the scheduled November completion date, arguably the time for performance, and thus compliance, had not come due.

■ The Court finds, contrary to the City and County's assertion that debtors did not develop a marketing plan, that debtors met their burden on this issue. Debtors, through Marshall Criss, testified that they had engaged in extensive marketing efforts to promote the Pyramid nationally and internationally. See Criss at 295. The debtors corroborated their testimony by

28. See Trial Ex. Nos. 108, 114–120.

producing two (2) volumes of media generated information, including flyers and brochures involving the project. The Court finds that contrary to the City and County's objections, the media material may be considered by the Court even though they were not admitted into evidence as a formal exhibit. Documents, exhibits, photographs and the like, may be used to explain a witness' testimony, even though they are not introduced as evidence. Moreover, Mayor Morris testified that he was constantly going to receptions and other events with the debtors' principals, at their urging, to tout the Pyramid and tell what a great project it was.

Once the debtors met their initial burden, the burden then shifted to the City and County to show that the debtors' efforts fell short. The City and County are hampered by the language of the contract which basically leaves the compliance deadline as to implementation to the debtors, constrained only by the caveat of "reasonableness." Further, debtors were only required "to develop" not implement the marketing plan and brochure during the development period.

██ City and County allege an additional event of default based on debtors' alleged failure to develop a comprehensive staffing plan. Debtors contend that a comprehensive staffing plan had been developed and that Leisure Management, successor to the debtors, used the marketing, research, and staffing plan developed by debtors from which to operate and manage the arena post termination. Debtors further contend that many of these responsibilities were delegated to Russ Simons of LMI and the City and County simply used the debtors' agents to fulfill, finalize and complete the agreements. Once debtors met their initial burden as to the averred event of default, the burden shifted to the City and County to show insufficiency of debtors' effort. The testimony and the documentary proof left a void. The Court finds that debtor offered insufficient information to meet its burden under 3.01(q); however, due to the City and County's silence and acquiescence, such default cannot

be deemed sufficiently "material", as it was not shown that this event jeopardized the ultimate contract. Because the City and County used the debtor's agent, LMI, and did not dispute that LMI used the plans which were developed in furtherance of PMA's contractual responsibilities to discharge their duties to the City and County under the Management Agreement, City and County are essentially estopped from claiming this as a material event of default which warranted termination of the Agreement.

*Pre–Opening Period*

Next, the City and County cited events of default under section 302(b), (e), (f), (i), (j), and (*o*), which respectively required the debtors to:

(b) Develop and implement public relations activities.

(e) Disseminate to Lessee (City and County) regular reports with respect to the status of marketing, design, construction, and operational efforts for the public facility.

(f) Negotiate and purchase furniture, fixtures and equipment for the facility.

(i) Identify, select and train manager's employees for the facility.

(j) Prepare and implement operating policies and procedures and develop rules and regulations.

(*o*) Design and implement a financial accounting system in accordance with generally accepted accounting principles, consistently applied.

The Court finds and concludes that the debtor has met its burden under section 3.02(b) and (e) based on the Court's previous discussion of related items under section 3.01.

As to sections 3.02(i) and (j), these items were to be completed during the pre-opening period. There is no evidence of PMA's compliance. Thus, PMA failed to meet its burden.

██ As to section 3.02(*o*), the City and County alleged that the debtors defaulted by their failure to "design and implement a financial accounting system in accordance

with generally accepted accounting principles ("GAAP") consistently applied." To support this contention, the City and County relied on the supportive testimony of Von A. Harshman, C.P.A., and the court-approved examiner for the debtors.[29] Harshman at 2509, 2511, and 2524. However, on cross-examination, Harshman conceded that there are no known "financial accounting standards for the maintenance of books and records of a developmental company." Harshman 2534.

The relevant colloquy is set forth herein:

Q. Can you tell me what standard financial accounting standard controls internal books and records of a developmental company?

A. There is a developmental standard as far as *reporting* guidelines. I'm not familiar with the number of it. But *as far as any requirement to keep books and records on a specific way,* that is up to the company itself, sir, how they want to maintain the records.

Q. So there is no financial accounting standards or standard with regard to how a developmental company would maintain its internal books and records?

A. To my knowledge, *no,* sir.

Q. There are financial accounting standards by which a development company reports its financial condition?

A. That's a correct statement, sir.

(Emphasis added).

 Debtors offered the testimony of Mr. James Gannaway of Arthur Andersen & Company, a certified public accountant for twenty (20) years, as a rebuttal witness to the testimony of Harshman. Gannaway confirmed that there is no applicable GAAP standard for the maintenance of internal books and records of an entity. Gannaway at 2560. The City and County argued that notwithstanding the lack of a standard, the contract by its language imposes the obligation of PMA to perform and is therefore binding. However, it is a fundamental rule that where contracting parties agree to a legal impossibility; performance is excused. *See South Memphis Land Co. v.*

*McLean Hardwood Lumber Co.,* 179 F. 417, 421–22 (6th Cir.1910); *cf. Haun v. King,* 690 S.W.2d 869, 871–872 (Tenn.Ct. App.1984).

Since the parties at section 3.02 contracted to a legal impossibility, the debtors' performance is excused, and no event of default occurred as both accountants agreed that GAAP applies to "financial reporting" and not to internal bookkeeping and record maintenance.

As to the furniture fixtures and equipment ("FF & E") addressed at section 3.02(f) and extensively at section 3.05(b), the Court finds that the debtors were not in compliance. In the debtors May 16, 1991 letter, they addressed the status of FF & E. (See Trial Ex. 69). Debtors stated:

"[t]he total cost of the items we feel are necessary to open and operate the arena in a first class manner is $8,428,-491, as set forth in detail at 'Ex. B.'"

Shlenker's letter proceeds to set forth the anticipated sources of funds to acquire these items, such as Memphis State University ($1,965,063), City and County ($850,000 for concessions) and a loan to PMA ($4,563,428). Criss testified that PMA "was in the *process* of putting together the funds."

Criss at 325 (Emphasis added).

The proof revealed that certain conditions had to be met before the debtors could access the funds of MSU and the City and County, and that PMA had not satisfied those conditions. See Criss at 661; Gurley at 1503–1504; Bennett at 2331; Cothern at 2459–2460 and 2480–2483; Shlenker at 1753–1754. In addition to being unable to access the collateral source funds, the debtors also had not secured the fourteen million five hundred sixty three thousand four hundred twenty eight dollar ($14,563,428) loan required to purchase FF & E. Shlenker at 1754.

The debtors testified convincingly that specifications for much of FF & E had been developed, as many items had been priced,

---

**29.** Mr. Harsham testified that he had approxi-mately nine (9) years of experience as a C.P.A.

and supplies identified.[30] Exhibit "D" to debtors' May 16, 1991 letter is illustrative, when it states:

"In order to complete the commissary and concession stands by the 1st of November, the $850,000 appropriated by the [C]ity/[C]ounty must be committed **NO LATER THAN THE 1ST OF JUNE....**"; that "The entire bidding process and the commitment of the $850,-000 **MUST BE COMPLETED NO LATER THAN THE 1ST OF JUNE;**" and, that "[T]his will allow us to meet a 1 November deadline, assuming that the remainder of the funds are made available **NO LATER THAN THE 1ST OF JULY, 1991.**"

Trial Ex. 69. (Emphasis added). There was no proof that PMA could obtain the funds by July 1, 1991. Moreover, Bennett testified that the PBA issued bids with respect to some of the FF & E.

Simons testified that by April 16, 1991, no steps had been taken to order press room equipment in satisfaction of section 3.05(b)(9), which would take some eight (8) months for delivery and installation. Simons at 840–863. However, the Court observes that in an earlier meeting, the City and County and debtors acquiesced in the former's bidding on the scoreboard and certain equipment. "See April 8, 1991 meeting notes of David Bennett."

Pursuant to section 3.05(b), PMA could arrange for sponsors to supply portions of FF & E. In the final analysis, under the Leisure Management Agreement (post termination), National Catering provided much of the funding for finishing out the concession areas.

Further, in response to the question, "Why did the PBA issue the request for bids?", Bennett responded:

The PBA was asked by the City and County to bid the equipment because we had the only set of documents that could be used to at that time [sic] utilize state funds. *We were still talking about using the revenues from Memphis States to pay for that equipment. So by bidding it according to their rules, we could then use their money to pay for it if Pyramid Companies so chose to do that later.*

Bennett at 2153. (Emphasis added).

City and County issued notices of default regarding the Management Agreement, the Hard Rock Agreement and the Escrow Agreement on April 16, 1991, including inter alia, defaults under sections 3.02 and 3.05 of the Management Agreement relating to furniture, equipment and the scoreboard. However, on April 17, 1991, Jim Martin of Pyramid companies, presented Bennett with queries regarding construction relative to the Hall of Fame and the Hard Rock Cafe. Bennett at 2160. Subsequently, on May 6, 1991, in the regular course, a "project review meeting" was held at City Hall. City and County, PBA, PMA, POA, HHN and Pickering were represented. See Bennett at 2164. The following testimony was elicited from David Bennett:

Q. At this point in time had PBA issued the bids for the scoreboard and basketball floor?

A. Yes. The bids at this point should have been on the street because they were due back—no, they came back on April 22nd, so we had the bids, and I'm reporting here that the total bids for the scoreboards and basketball equipment was under budget.

Q. Was it still anticipated that Memphis State funds would be used to purchase this equipment?

A. Yes.

The projected opening date had been extended to November, 1991. Correspondence between the debtors and the City and County continued in the regular course regarding construction of the project. See

---

**30.** See Ex. 65, section II.A. at 7 concerning Memorandum from Jerry McDonald to Criss wherein he stated:

LLM has assisted Manager in ensuring that all items (with the exception of Items Nos. 13 & 14 [trophy/display cases and locker room

training equipment] ) are currently in the prepared 'Equipment, FF & E Build Out Bid Process' document [Ex. 173] that was distributed to the City/County during the April 12, 1991 joint meeting. These items are currently being bid or are being prepared to go to bid.

Trial Exs. 349, 350 (letter to Roger Allison re letter of credit); Ex. 351 (June 5 letter from Martin regarding outer covering of building); Ex. 352 (Martin's June 11, 1991 letter regarding HVAC). Although it was the responsibility of the manager to provide FF & E, PBA bid on many of the items because they had bid packages in their control. The bid packages were written with the idea of utilizing state funds. Bennett at 2154.

Many of the debtors' (PMA and POA) recommendations were added by change order at substantial cost to the debtors and inured to the benefit of PBA/HHN as they became a part of the base building.

Paul Gurley testified that the responsibility for the concession area design was that of HHN and RFI, and that PMA had the responsibility for reviewing the "scope drawings and designs and commenting on them." Gurley at 1436. Gurley acknowledges that PMA advised the City that the concessions were inadequate in design, number and location; and as a result of PMA's efforts, the City and County adopted those changes. Gurley 1437. It was the City and County's responsibility to pay for those changes and a part of the City and County's budget only. Gurley at 1437.

*Alleged Defaults Under Sections 4.06 and 4.07*

■■■ Pursuant to sections 4.06 and 4.07, PMA was required to provide certain budgets to the City and County within thirty (30) days from "beginning of pre-opening period," and ninety (90) days from the execution of the Management Agreement, respectively. See Trial Ex. 12 at 17. From July 21, 1989, and through the contract termination date, PMA supplied certain budgetary information to the City and County, largely related to operating expenses. In March, 1991, PMA submitted a budget for the months of January through September. Criss at 206–207; Trial Ex. 41. During this time, the City and County received the information without objection and are therefore essentially estopped to allege this failure as a "material" event of default warranting termination of the

agreement. Under Tennessee law, the interpretation given to a contract by the parties themselves as shown by their acts will be adopted. *Tennessee Enamel Mfg. Co. v. Stoves, Inc.*, 192 F.2d 863, 868 (6th Cir. 1951), *cert denied*, 342 U.S. 946, 72 S.Ct. 561, 96 L.Ed. 704 (1952); *Campbell v. American Limestone Co.*, 109 F.Supp. 741, 750 (E.D.Tenn.1951) *aff'd*, 201 F.2d 670 (6th Cir.1952). It is expressly noted by the Court that the City and County, in hindsight, raise numerous technicalities to justify the termination. This is evidenced by the City and County's assertion that when budgets were finally sent, they were not in compliance because they were, inter alia, directed to the wrong persons, i.e., the City and County's attorneys received the budgets instead of the City and County's CAO's as required by the language of the Management Agreement. However, forfeitures are not favored under the law. *See Turner v. Yow*, 657 S.W.2d 94, 97 (Tenn. App.1983).

*Duty and Liability Section 3.06*

■■■ Did PMA commit a material event of default with respect to section 3.06? The notice of default did not recite any facts to support its allegation of default under section 3.06. Section 3.06 provides in toto:

**3.06 Duty and Liability.** The Manager shall owe to Lessee a duty to perform its obligations under this Agreement and to conduct the management and operation of the Public Facility at all times as a *first class facility* with integrity and *good faith* and in a manner that *it believes to be in the best interests* of the Public Facility and Lessee and consistent with the terms of this Agreement. The Manager *shall not be liable, responsible or accountable* in damages or otherwise to Lessee or to any other person *for any act or omission* that is within, or *that the Manager in good faith believes to be within,* the scope of its authority under this Agreement, including acts or omissions constituting negligence, *except for* (i) acts or omissions of the Manager or its employees or agents

not in good faith or involving gross negligence, intentional misconduct, or knowing violation of law, (ii) any transaction from which the Manager or its employees or agents derives an improper personal benefit, or (iii) *any wilful Event of Default on the part of the Manager or its employees or agents.*

(Emphasis added). The contract provided that the manager will be liable only for "Any Wilful Event of Default". Consequently, the City and County had a contractual obligation to allege specific acts or omissions to show wilfulness. The Agreement, however, did not define wilful. Case law has interpreted wilful to imply intentional acts reflecting a lack of good faith or an evil motive. *Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480 (5th Cir.1986). Thus, prevailing case law imposes a duty on the City and County to allege specific acts or omissions which evidence a lack of good faith or an evil motive. A mere showing that debtor simply could not obtain financing to complete his obligations, especially where there is overwhelming proof of debtors' efforts to secure such financing, is not enough to constitute a "wilful" event of default.

Thus, the Court finds that even assuming there was a default under section 3.06, the notice was ineffective to put the manager on notice to correct any alleged default. Moreover, Agreement at 11.03 required *specificity* as to the alleged events of default. Thus, the City and County were required to allege specific acts and omissions which provided a basis for a "wilful" default.

Further, there was nothing in the proof to support a "wilful event" of default. It appears that financing was the factor that undergirded everything else in this project. The manager at all times represented to the City and County and its agents that it was working to put together adequate financing from a variety of sources for the completion of the project. Indeed the debtor evidenced an eighty million dollar ($80,000,000) permanent loan commitment from Teachers. Thus, as the Court earlier opined, this failure to obtain financing was unfortunate and potentially fatal to the project, but it, based on the proof, was *not* wilful. As debtor explained through the testimony of Marshall Criss, events over which the debtor had no control and did not foresee, such as the Persian Gulf War and the Savings and Loan crisis, adversely affected lending practices to the detriment of the debtors' participation in the project.

Also, the Court expressly notes that the language in section 3.06 is vague, imprecise, and left much to the subjective interpretation of the manager.

█ Next, the City and County contend that debtors violated section 3.06 by failing to completely design and construct the luxury suites or skyboxes. The original responsibility for the skyboxes rested with the City and County and MSU, respectively. The City and County contend and this Court so finds, that PMA voluntarily assumed this responsibility for certain consideration, evidenced by Shlenker's June 22, 1990 letters to the Mayors. See Trial Ex. 221. Here the question arose as to whether this constituted an amendment to the contract which effectively shifted the responsibility. The Court does not have to address that issue, since debtors admittedly undertook this responsibility. On the other hand, the debtors and MSU on August 3, 1990, entered into an agreement shifting responsibility for the MSU skyboxes. Debtors did not complete either the City, County or the MSU skyboxes within the required completion time. The Court finds that the debtors' default as to the skyboxes constitutes a material event of default.

The City and County alleged a breach of section 3.06 which imposed on the manager a duty to Lessee (City and County) to perform its obligations under the Management Agreement and to manage and "operate the facility as a first class facility in a manner it [PMA] believes to be in the best interest of the Public Facility and Lessee and consistent with the terms of the agreement." This language is so vague, imprecise, and subjective as to be virtually impossible, absent gross negligence, to sustain a material event of default. Moreover, the contract went on to exonerate PMA

from liability in certain instances providing that the manager is reasonably pursuing a cure. See Management Agreement, section 3.06.

The Management Agreement neglects to define the term "first class facility". The testimony of Criss and Bennett provide ample evidence of debtors' suggestions, requests and exhortations regarding changes which would upgrade the facility; e.g., additional elevators; expanding HVAC to increase load and cooling capacity; expansion of rigging grid to make arena feasible for a greater variety of events; and an increased number of concession areas with greater hot food capacity and enhanced acoustical improvements. See generally testimony of David Bennett. The base building or fixed cost contract between PBA and HHN provided that most of the items mentioned were a part of the base building contract. But as Bennett testified, in a fixed-cost contract, the contractor has the incentive to maximize profit and could theoretically use lower quality items to technically satisfy the contract. Debtor avers that as a result of non cooperation by HHN and poor coordination by Pickering, HHN engaged in deliberate cost shifting to the detriment of the debtor, (i.e. rigging grid, and HVAC).

Section 3.4 of the Hard Rock Lease Agreement, captioned "Cooperation During Construction", states:

> The parties understand and agree that the ultimate goal of both Lessor and Lessee is to effect [sic] construction of the completed Project together with Lessee Improvements and all other activities so that the Lessee's business in the Premises and the opening of the balance of the Project will occur as nearly as practicable and possible at the same time. To that end, Lessor and Lessee agree to use their best efforts to cause all of their agents and independent contractors to act in a fashion to accomplish such a goal.

PBA was to construct a base building for the Pyramid structure itself, including the various mechanical and electrical systems. It was POA's obligation to finish out and improve the shell space (constituting the designated lease premises) with various attractions at its own expense and with its own contractors. POA did *not* complete the project and raises "impossibility of performance" as a result of the June 17, 1991 ouster, as an affirmative defense.[31]

There is no question that the portion of the project which was completed in time for the 1991 Memphis State Basketball fall season, was not the kind of finished product that the parties had envisioned. Though the basic structure was completed by the fall of 1991, most of the distinctive attractions which would have made the Pyramid building truly outstanding were left unfulfilled to the disappointment of all involved. As typical with most construction projects, the parties experienced numerous delays and cost overruns, despite the project being a "fixed-cost, design-build" contract.

Participants on both sides of the agreements have consistently cast stones as to which side was materially responsible for the project's delays, cost overruns and finally the disintegration of the project as it was initially envisioned. As stated previously, the parties had a good working relationship throughout most of time during which the parties operated under the respective contracts. However, because of the relative positions of the parties, there were obvious points of disagreement and differing perceptions and judgments as to how the base building and its mechanical systems should be built. For example, there were disagreements as to the adequacy of the stage rigging grid[32] and catwalk stage to be installed in the arena, and as to

---

31. This Court does not in this opinion address debtor's allegations of impossibility of performance. That is a specific potential cause of action which debtors may preserve.

32. Stage rigging is a structure used to support sound, lights theatrical curtains and any mechanisms that are suspended over a performance stage. The HHN specifications provided an eighty thousand (80,000) pound rigging grid capacity, which would have been unable to independently accommodate a Ringling Brothers Circus or a Madonna show. Debtors' proposed a minimum one hundred thousand (100,000) pound capacity rigging grid. See Trial Ex. 353, Event Grid Structure at the Great American Pyramid, by R.A. Roth, Inc., Dec. 14, 1989.

whose responsibility it was to fund this portion of the project. Although POA had its own contracting department and had hired an independent general contractor, designers and architects, the base building contract with HHN included specifications for these structures. Bennett at 1849. However, the specifications included in this contract were not those for a grid conducive for the type of "first class" facility that the Pyramid was intended to be. Both Leisure Management and POA were of the position that a larger grid with the capacity to provide rigging services to larger shows on the level of the Ringling Brothers Barnum & Bailey Circus was needed. During the course of construction, the general contractor, HHN, was clearly at odds with PMA, and the relationship was acrimonious. This conflict was recognized by Bennett, who testified that the working relationship between POA and HHN was not good. See Bennett at 2259. Various designs for the rigging grid were studied by HHN, Pickering, and POA. However, though the cost of the grid was to have originally come from public funding, this cost was ultimately borne by POA. Likewise, various other modifications of the structure were needed in order to make the facility one of high quality and of great capacity. See change orders 106, 114 through 120.

One significant change pertaining to construction, for example, concerned the HVAC system. After the commencement of construction, it was determined that the facility required a larger HVAC system. Conflicts regarding the additional cost of the larger system arose between POA and HHN. Again, the cost was ultimately placed on the debtors.

As previously discussed, another significant dispute during the course of construction was the concession area. Under the Lease Agreement, POA was to provide the fixtures, furnishings and equipment, while it was the responsibility of HHN to construct the concession shell. However, because of the large capacity of the facility, it was determined that the original specifications of the concession areas were inadequate. Again, there was an attempt to shift the additional cost for the larger concession shells to POA. The attempt to maintain the original cost of construction by HHN and the City and County was in direct conflict with providing certain necessary features to make the facility sufficiently operable, and no doubt in conflict with the overall goal and contractual obligations of PMA, of creating a "first-class" facility.

Furthermore, the testimony of Bennett revealed that HHN was proceeding in the construction of the facility from "shop drawings"; however, neither HHN nor Pickering timely provided those shop drawings to POA.[33] At the same time, the

---

33. The problems evidenced by the lack of shop drawings are dramatized by the August 22, 1990 letter from Jim Morton of Pyramid Co. to David Bennett and recited in part herein:

As you know, we requested shop drawings when we became aware that ductwork was being installed contrary to the base building construction documents which we were using as the basis for our design. We and Rosser Fabrap Inc. (RFI) were unaware of the unapproved changes that were being allowed to be installed. This concerned us with regard to ductwork and also plumbing changes that were observed. The fire loop had not yet been installed so we requested shop drawings to verify where the contractors had decided he was going to install it.

It is unfortunate that The Pyramid Companies could not have benefited from having a good working relationship with the base building contractor.... It was not our responsibility to work directly with Huber, Hunt, and Nichols (HHN) to negotiate changes to their work as your letter suggests.

We are concerned about the installation of plumbing and ductwork we have observed. It appears that piping and ductwork have not been kept up tight to the structure above and out of the tenant's space.... We have also observed storm drainlines that were designed to run out in the apron area that have been relocated by the contractor to run inside the tenant space, thereby restricting development of the tenant space.

It seems that with the design/build contract, the contractor makes changes to the construction documents without submitting for formal approval and that the design engineers, who were hired by HHN, are not responsible for authorizing changes or looking after the building owners or future tenants interests. We are left having to respond to whatever gets built in place.

debtors' contractors were working from "design drawings" provided by Pickering from the outset of the project. Design drawings are renderings that are much less detailed and therefore harder to read; whereas, shop drawing consist of specific renderings of proposed construction. Bennett testified that subcontractors working on the project would note any changes which were made on the shop drawings. Though HHN had access to these shop drawings, they were not made available to POA until August 1990. Bennett at 2260–2261. Clearly such acts exemplified the lack of reciprocal cooperation that characterized the relationship between HHN and POA.

Within the myriad of disagreements and conflicts was the role of Pickering, the engineering firm, overseeing the Pyramid's construction. Pickering represented both the interests of the City and County and POA. The role played by Pickering created a perception of conflict of interest. Such a role would also prove very difficult to remain unbiased, especially under the difficulties that eventually arose. In fact, Bennett, the project manager employed by Pickering, testified that the relationship between the debtors and HHN was "antagonistic". Further, indicative of the problems among the debtors, the City, the County, and HHN was Bennett's demeanor during portions of his testimony which showed a certain bias in favor of the City, County, and particularly HHN, and obvious contempt, bordering on disdain for the debtors. His demeanor surely was not reflective of the neutral role that Pickering was initially expected to play. Therefore, such an environment was not one characterized by or conducive to good faith and fair dealing.

> Your last paragraph requests that JPI take whatever steps are necessary to assure that the base building services are adequate to meet tenant needs. My response is, they aren't, they were all stripped out of or never designed into the base building for various reasons. We are dealing with the lack of provisions for tenant improvements as they arise.

*Defaults Under 8.02*

The Management Agreement at section 8.02 required the manager to "exercise its best efforts to obtain and maintain in effect" certain enumerated policies of insurance, including "such other coverage as manager, in its discretion, may deem prudent or necessary." [34]

This section did not impose a strict duty of the manager to maintain the types and amounts of coverage enumerated, but only required the manager to use "its best efforts." This section is imprecise and left much discretion to the manager. Inasmuch as the manager exhibited a Master Insurance policy, the burden shifted to the City and County to show that PMA did not "exercise its best efforts." Such was not done and the City and County erroneously construed the contract to require the provision of five million dollars ($5,000,000) in business automobile insurance. Thus, no event of default was shown under section 8.02.

*Good Faith Disputes*

■ Article 11 deals with default. Section 11.01 provides, "each of the following shall constitute an 'Event of Default'" under this Agreement:

(i) Failure to pay under section 7 when due any amounts required to be paid under this Agreement, if the failure continues for five (5) days after notice has been given to the defaulting party;

(ii) Failure to perform any other material obligation under this Agreement, if the failure to perform is not cured within thirty (30) days after notice has been given to the defaulting party, except that if the default cannot reasonable be cured within thirty (30) days, an Event of Default shall not be deemed to have occurred if the defaulting party begins to

Trial Ex. 356; **Note:** This exhibit was not admitted for the truth of the matters asserted, but to show the environment in which events were occurring.

**34.** See also, Trial Ex. 131, Memorandum of Understanding Relative to Management Agreement, which likewise requires debtor only to "use best efforts to *obtain* and *maintain* insurance." (Emphasis added).

cure the default within the thirty (30) day period and diligently and in *good faith continues to pursue the cure of the default;* or,

(iii) Failure of POA to submit the plans and specifications required by Section 3.2 of the Lease within 120 days from and after execution of this Management Agreement and the approval of Lessee's legislative bodies, if such approval is required.

(Emphasis added). As a specific remedy under the Management Agreement, the lessee could elect to "terminate the contract." Trial Ex. 12 at 11.04(iv). However, the contract could only be terminated for "just cause." See section 10.04. Immediately after the default provision, the Management Agreement at section 11.05 addressed "Good Faith Disputes" and stated:

**11.05 Good Faith Disputes.** In the event that any party *shall dispute, in good faith, that any act or omission* on *its part constitutes* or *will constitute a default or* an *Event of Default,* such party may give the other party written notice, specifying in reasonable detail the basis for the dispute, and may, thereafter, withhold payment or other action with respect to the amount or matter in dispute (to the extent it is in dispute) and an Event of Default shall not be deemed to have occurred by reason thereof unless and *until such dispute is determine adversely to the non-performing party* and such party does not thus promptly remedy its non-performance; provided, however, that this provision shall not apply to the obligations of Manager under Section 5.01.

(Emphasis added). The City and County argue that PMA never invoked section 11.05 and therefore may not avail themselves of that provision. However, nothing in the Agreement requires that a party must specifically invoke this section. PMA's dispute concerning the alleged default was sufficient. Thus, under the terms of the contract, once PMA disputed the default, City and County could not unilateral declare that any dispute had been determined adversely against PMA such as

to give rise to an event of default. *See Harrell v. Dean Food,* supra.

*Sufficiency of Notice*

Section 11.03 of the Management Agreement between the parties governs the notices of default and states:

**11.03 Default Notices.** The non-defaulting party shall promptly notify the defaulting party of any acts or omissions believed by the non-defaulting party to be an Event of Default under this Agreement. In order to be effective for purposes of Section 11.01 or 11.02 or to constitute Just Cause for termination of this Agreement, a notice of a default *must be timely given, must state that it is a notice of default and must specify in detail the acts or omissions alleged to constitute a default of this Agreement.*

(Emphasis added). The Agreement specifically required that the notice "must specify in detail the *acts* or *omissions*" alleged to constitute a default." (Emphasis added). The City and County's notice recited contractual section numbers generally but contained *no* specific acts or omissions to support the alleged events of default so as to warrant termination. Therefore, the notices did not strictly comply with the contract and were insufficient as a basis on which to predicate termination of the contracts.

*Dispute in Relation to Funding of Escrow Account*

In its Notice of Default, the City and County declared that "an event of default occurred for PMA's failure to comply with Article 5, section 501 in the maintaining of a $3 million dollar reserve fund in escrow." Section 5.01 of the Management Agreement reads as follows:

Reserve Fund. (a) On or before ninety (90) days following the execution of this Agreement, Manager shall establish from sources other than bond proceeds in cash, letter of credit or equivalent, in escrow with a mutually acceptable escrow agent, for the benefit of Lessee, a Reserve Fund in the amount of three million dollars ($3,000,000). Lessee shall have the right to draw upon the Reserve

Fund by giving written notice to the escrow agent of an Event of Default created by Manager's failure to pay Lessee any amount due Lessee pursuant to Article 7, when due, but only to the extent necessary to make the full payment then due.

(b) Manager and Lessee agree to execute such escrow agreement as may be required by the escrow agent to establish the Reserve Fund.

(c) Manager shall be entitled to receive any and all interest earned on the Reserve Fund and shall further be entitled to distribution of the balance remaining in said Reserve Fund, if any, upon the expiration of the term of this Agreement.

(d) Manager shall have no obligation to restore the Reserve Fund for any draws thereon, except at the times and in the amounts set forth in Section 2.03(b)(2).

Concomitantly, Article 11.01(ii) cites as an Event of Default,[35] PMA's:

[f]ailure to perform any other *material obligation* under this Agreement, if the failure to perform is not cured within thirty (30) days after notice has been given to the defaulting party, *except that if the default cannot reasonably be cured within the thirty days period, an Event of Default shall not be deemed to have occurred if the defaulting party begins to cure the default within the thirty day period and diligently and in good faith continues to pursue the cure of the default.* (Emphasis added)

Article 11.04(iv) gives the non-defaulting party, in this case the City and County, the right to terminate the Management Agreement provided that PMA fails to cure within the stated period, and provided that the default can reasonably be cured, and that the debtor did not in good faith attempt to cure.

The Amendment to the Escrow Agreement, dated January 10, 1991, requires the GOI stock held in escrow and valued by agreement until April 1, 1991, be replaced with cash, letter of credit, or mutually

agreeable marketable securities. See Trial Ex. 9. The Amendment, in addition, imposed upon PMA the obligation to replace the GOI stock "on or before the termination of the fixed valuation period" with cash or securities that had a readily ascertainable market value. See Trial Ex. 9. The fixed valuation date expired on April 1, 1991. It is undisputed that PMA failed to replace the GOI stock in accord with the terms of the Escrow Agreement as amended.

Upon the expiration of the fixed valuation date established by the Escrow Agreement as amended by Exhibit B thereto, a string of letters began to circulate among the City, the County, the Escrow Agent, John Tigrett and his attorney, as well as PMA. The GOI stock is owned by the Jovest Foundation and controlled by John Tigrett. In their letter, dated April 15, 1991, PMA expressed their belief that it was "Tigrett's obligation to replace the stock with such collateral acceptable to the City and County." See Trial Ex. 48. The letter also indicates that the City and County had previously released seventy five thousand (75,000) shares of GOI to PMA on January 10, 1991. The subject stock was delivered to Tigrett, as agent for PMA, but despite the request of PMA, Tigrett refused to deliver these seventy five thousand (75,000) shares to PMA. PMA stated that it was amenable to returning these shares to the escrow account to cure the deficit in the market value. Specifically, PMA expressed the "belief that if the GOI shares and the International Broadcast System, Ltd. shares held in escrow, are liquidated in an orderly manner, as dictated by the fiduciary duty of the Escrow Agent, the net cash to the escrow account, including the cash currently held in escrow will equal, or exceed, the three million dollar ($3,000,000) minimum balance required, and no default will exist."

*Purported Default Under Escrow Agreement*

The City and County contend that PMA breached the terms of the Escrow Agree-

---

**35.** The Management Agreement defines the term, "Event of Default" in relation to the three events appearing in Article 11.01. For the purposes of this discussion, only section 11.01(ii) is applicable.

ment, as amended and incorporated into the Management Agreement, by failing to replace the GOI stock or cure the deficiency caused by the valuation of the GOI stock at zero, thereby creating an Event of Default under the Management Agreement. To counter this contention, PMA argues that the Management Agreement was not incorporated by reference by virtue of the recital sections of the Escrow Agreement. The PMA further argues that the integration of one contract into another must be done specifically. And, in particular, PMA asserts that the Escrow Agreement is not and cannot be considered an amendment to the Management Agreement notwithstanding the recitals, because section 12.02 of the Management Agreement states the agreement may be amended.

The Default Notice contains the following language: "We are also notifying you that it is an event of default under the Escrow Agreement itself due to your failure to provide a replacement of the 'GOI' stock." In its recitals, the Escrow Agreement refers to the Management Agreement and its attached Exhibit A and makes that agreement a part of it, "relative to the management and operation of the Public Facility." Specifically, section (1) of the Escrow Agreement states that "[p]ursuant to the provisions of Section 5.01 of the Agreement, Manager hereby deposits with Escrow Agent the sum of three million dollars ($3,000,000) (the 'Reserve Fund'), to be held by Escrow Agent for the benefit of Manager and Lessee, for the purposes and on the terms and conditions herein contained."

### Propriety of Notice

▬ In its notice of default, dated April 16, 1991, the City and County indicated that PMA was in default based on its failure to comply with Section 5.01 of the Management Agreement by maintaining a three million dollar ($3,000,000) reserve

fund in escrow. Section 2(a)(i) of the Escrow Agreement provides that the form and type of notice shall be as specified in sections 11.03 and 12.01 of the Management Agreement. Although the City and County complied with the requisite formalities, again the question arises as to the propriety of notice and whether an actual default occurred under the Management Agreement via the Escrow Agreement. The City and County's claims here are less tenable than under the Management Agreement because the integration of one contract into another must be done specifically and the parties' intention to do so must be specifically expressed. *See Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir.1985). Likewise, merely mentioning in the recitals [36] that the parties have entered into a preexisting agreement is not enough to work a sufficient incorporation. The succeeding agreement must state that it incorporates a previous agreement. *Id.*

### Propriety of Termination

The Escrow Agreement, although created to meet the requirements of section 5.01 of the Management Agreement, is a separate, independent agreement and cannot be incorporated and included in the default provisions of the Management Agreement by mere reference in the recitals [37] or because it is a related agreement. *See e.g., Harrell v. Dean Food Co.*, 619 S.W.2d 528, 533–34 (Tenn.App.1981) (distributorship agreement and sale option agreement were two separate agreements and provision granting right to terminate in one agreement could not be read into other where such right had not been expressly provided). So, the City and County's right to terminate, as that right relates to the Escrow Agreement, is accordingly limited to specific provisions of the Escrow Agreement providing such an obligation and right. *See id.* The Escrow Agree-

---

**36.** The relevant recital reads: "WHEREAS, as of April 14, 1989, Lessee and Manager entered into a Management Agreement (the 'Agreement'), a copy of which is attached hereto as Exhibit 'A' and made a part hereof, relative to the management and operation of the 'Public Facility', as such term is defined in said Agreement."

**37.** Specifically, the recitals reference the Management Agreement and makes it "a part" of the Escrow Agreement.

ment provides no such right and nor is it derived through the incorporation of section 11.04(iv) of the Management Agreement into the Escrow Agreement.[38] In addition, no such right can be said to have been created from the whereas clauses because such clauses cannot create any rights beyond those arising from the operative terms of the agreement. *Lebow,* 761 F.2d at 103.

 In relation to the purported default of PMA under the Escrow Agreement pursuant to the terms of that agreement, this Court will abstain from making this determination. The Court will defer to the chancery court's determination of rights in the assets of the escrow fund in the actions[39] before it. However, this Court does conclude that since the state court litigation preceded the purported termination, the City and County had full knowledge of the litigation. Inasmuch as they are a party, the City and County may not make a unilateral adverse determination on this issue. Further, the City and County had full knowledge that debtors disputed the alleged shortage. The City and County therefore are essentially estopped from claiming a material event of default under the Management Agreement pending the chancery court's determination of rights and obligations under the Escrow Agreement.

Based on notions of comity and out of respect for state law, the Bankruptcy Court will abstain with respect to all issues regarding the Escrow Agreement. Further, the Court expressly observed that all parties necessary to afford complete relief are not properly before the Bankruptcy Court, which provides another basis for discretionary abstention. *See* 28 U.S.C. § 1334(c).

**38.** Based on the finding that the Escrow Agreement includes no right of termination, this Court does not need to determine the propriety of notice.

**39.** These actions are styled: *Union Planters National Bank v. Pyramid Management Authority, Inc., Sidney Shlenker, John Burton Tigrett, The*

### Hard Rock Lease

 Next, the Court turns to an analysis of the purported termination of the Hard Rock Lease Agreement. On April 16, 1991, the City and County issued a letter re: "Default Notice Issued Pursuant to Articles 17 and 22 of the Hard Rock Lease Agreement" on which the City and County later based its June 17, 1991 PBA lease termination.

### Sufficiency of Notice

Article 17 of the Hard Rock Lease is styled *Defaults and Remedies,* and proceeds at section 17.2, *Events of Default,* to delineate a series of acts which may constitute a default. At 17.02(h), the agreement provides that an event of default occurs on "the failure of the lessee to perform or comply with any of the terms, conditions, or covenants, of this lease to be observed or performed by lessee for more than thirty (30) days after *written notice shall have been given* to lessee. (Emphasis added).

 At section 17.3 styled, *"Termination of Lease",* the agreement provides that the lessor may immediately terminate the lease "without service of notice or resort to legal process." These two provisions appear to be in conflict, one with the other. Where language of the contract is in conflict, the language is to be construed to give the contract an interpretation which is reasonable and which reflects and effectuates the intent of the parties. *See Gee v. Federal Express Corp.,* 710 F.2d 1181, 1186 (6th Cir.1983). While these particular clauses are in conflict, it does not however affect the Court's overall determination.

In reviewing the Notice of Default regarding the Hard Rock Lease and the City's addendum styled *"Existing Defaults/Anticipated Defaults,"* see Trial Ex. 43, the Court finds that the degree of specificity contained therein is sufficient to

*Jovest Foundation, City of Memphis, Tennessee and Shelby County* (Chancery No. 100043–1) and *John Tigrett v. Sidney Shlenker, Pyramid Management Authority, Inc.; The City of Memphis, Tennessee; Shelby County, Tennessee; and Union Planters National Bank, N.A.* (Chancery No. 100052–3).

provide the debtors notice of the bases on which the City and County were relying for termination of the lease. Based on the foregoing, the Court finds that the notice pursuant to the Hard Rock Lease was sufficient under the terms and provisions of the contract.

The Court will then examine whether or not such events of default occurred on which the City and County might reasonably and justifiably base their determination to terminate the lease. The Court will again deal with these seriatim.

*Propriety of Termination*

First, the City and County cited violations pursuant to section 2.2 of the Hard Rock Lease Agreement which is styled, *"Lessee's Commencement of Business and Requires That Lessee Improvement Be Completed Within Sixty Days of the Commencement Date."* The commencement date is defined in the contract at section 1.1(c) as the earlier of: (1) the date lessee opens the premises for business, or (2) the date which is the number of days specified pursuant to section 3.2 for completion of lessee improvements calculated from and after the date lessor notified lessee in writing that lessor improvements have been substantially completed and authorizing lessee to commence construction of improvements. It is undisputed that at the time the contracts were purportedly terminated, lessee had opened no part of the facility for business. Thus, no event of default is triggered under this subsection.

■ The Court will next address subsection 2.2(iii), which relates to the notification of "substantial completion" by the lessor in writing to the lessee. The testimony in the record does not reveal that the City and County ever provided such a notification in writing to the lessee. The City and County aver that the Tenant Improvement Escrow Agreement satisfies the "written notice" requirement. See Trial Ex. 17. Various testimony of witnesses, including David Bennett and Brian Kuhn, indicate that the debtors were well aware of the substantial completion of the project, as they were on the site almost on a daily basis. However, the contracting parties specifically required that notification be provided to the debtors in writing in order to trigger the time under sections 1.1(c) and 2.2 of the lease. As no written notification was ever submitted, arguably under a strict construction of the contract, the time for the debtors' performance had not come due such that a cause of action could be triggered under the contract. However, the Court must consider both conduct and words. Under a totality of these particular circumstances, the Court finds that the debtors' actual knowledge of the "substantial completion" of the facility is sufficient under section 2.2 to trigger the obligation to perform. Debtor is therefore essentially estopped to deny knowledge of substantial completion, notwithstanding the failure of the City and County to supply written notification.

Section 3.2 required the lessee to submit plans and specifications within 120 days from and after the date of the lease. Further, the contract provided that "lessee shall at lessee's sole expense, prepare and furnish to lessor detailed plans and specifications for completion of lessee improvements to the premises." This provision went on to require that the plans should be accompanied by a letter from the lessee specifying the number of days reasonably required to complete said lessee improvements. However, section 3.2 of the contract hinges on section 3.1 which requires that the lessor notify lessee "in writing" when the lessor's improvements have been "substantially completed." Debtors argue that this notification requirement is a condition precedent to the debtors' obligation to perform. Under such a construction, absent a showing that the City and County notified the debtors in writing of the substantial completion of the project, debtors arguably were not required to perform. The Court finds this argument untenable and unpersuasive where the debtors had actual knowledge. Adoption of this procedure would exalt form over substance and would not effectuate the obvious intent of the parties. The Court thus finds that debtors had actual notice of the "substantial completion." Based on such actual

knowledge, and under principles of equity, debtors' obligation to perform under 3.2 was triggered.

■ The Court observes that section 3.2 of the agreement required the lessee to submit plans and specifications within one hundred twenty (120) days from and after the date of the lease. The date of the lease was June 27, 1988; therefore, the bar date for performance would have been approximately October 27, 1988. During that time, the parties to the original lease agreement were the PBA and the Hard Rock Memphis.

In March 1989, an agreement styled, "Assignment of the Hard Rock Cafe Lease Agreement," [40] was executed on behalf of Hard Rock Memphis by its President, Isaac Tigrett as Assignor and by Sidney Shlenker as President of POA, Assignee, assigning the Hard Rock Lease Agreement. The body of the Agreement recites at paragraph 3 in relevant part as follows:

> "to the best of its knowledge and belief, *there are no defaults existing,* as *of the date of this agreement by* either of the original parties under the terms and conditions of the lease, with the exception of the default alleged by lessor as set forth in the letter of January 27, 1989 regarding the furnishing of plans and specifications by lessee pursuant to Article 3, section 3.2 of the lease.

See Trial Ex. 10. While the contracting parties specifically excepted the requirement of plan submissions from the assignment of the lease, no new date for performance was established in the assignment of the lease.

In a separate addendum styled, "Consent", the lessors, the Mayors of Memphis and Shelby County, engaged in a separate assignment of lease and sublease wherein the City and County specifically accepted the sublease which acknowledged that performance as to the plans and submissions had already passed. Again, the lease assignment as executed was devoid of any new dates for performance as to plan submissions. Because that provision was already in default at the time of the sublease which the City and County fully accepted, the City and County arguably may not go back and claim that provision as a material default on which to base its June 17, 1991 decision to terminate.

On March 28, 1989, Pyramid Operating Authority and the City and County executed a document styled, "Amendment to Lease Agreement." However, this amendment to the lease agreement likewise did not address the time for submissions of plans and specifications even though the area of the lease space was amended and increased.

The City argues that it gave H.R.C. notice on January 27, 1989 that the City and County was declaring a default pursuant to section 3.2 of the contract for failing to supply detailed plans and specifications in a timely manner. Further, the City and County argue that inasmuch as Shlenker was aware of the default even before he acquired the interest in the lease agreement, POA is now estopped to raise this as a bar. The City and County aver that Shlenker requested and the City and County agreed to an extension of time to cure the default until the lease agreement had been assigned. This agreement is not reflected in the written document; and ordinarily parol evidence would require its exclusion. However, it is the testimony of Criss that the parties agreed that the period of time for performance would be extended until one hundred twenty (120) days from the execution of Management Agreement in order to cure the default. Although the contract is silent as to this material term, the admission of an adverse party may be used to supply that term. The Court finds that the debtors were required to submit plans and specifications within one hundred twenty (120) days from April 14, 1989.

Further, since the plans and specifications provided in section 3.2 refer to design plans and did not specify other particular

---

**40.** This assignment of lease agreement made this 28th day of March 1989 by and between H.R.C. (Memphis), Inc. formerly known as Hard Rock Cafe International, (Memphis), Inc. However, the agreement in its witness clause reflects an execution date of March 10, 1989.

types of plans, arguably upon the submission by the debtors of the initial plans, debtors had met their contractual obligations under this section of the contract.

Therefore, based on the literal reading of the Hard Rock Lease Agreement, no material event of default had occurred under section 3.2 which would have given rise to "cause" for terminating the lease agreement. However, under equitable considerations, since debtors had actual knowledge of the extended time for submission of plans, they may not escape their contractual responsibility by relying on such a technicality. The intent of the parties was to insure that the lessee timely submitted plans and specifications to facilitate the orderly completion of work for a fall 1991 opening of the Pyramid.

The City next argued a default under section 3.3 of the Hard Rock Lease Agreement styled, "Lessee Improvement." This section required the lessee upon receipt of the notice referred to in section 3.1 to proceed "as soon as practicable" with construction of the lease improvements." POA contends that under the written language of the agreement, its obligation to perform did not arise until compliance by the City and County with the written notification required under section 3.1 of the agreement. The City and County argue that debtors had knowledge of the substantial completion of lessors improvements which excused compliance with the literal provisions of section 3.1. For example, the City and County cite the debtors' letter of September 22, 1989, wherein POA advised Willard Sparks, Chair of the PBA that:

Based on our ability to immediately commence certain parts of the construction which can be effected [sic] outside of the lease premises, and assuming that there will be no undue delays in receiving access to the lease premise for Huber, Hunt and Nichols, Inc. in the ordinary course of the construction process, we currently estimate that completion of lessee improvements can be accomplished in a period of seventeen (17) to eighteen

(18) months to coincide with the opening of the Pyramid.

See Trial Ex. 237 at 2.

The Court again reasons and finds that POA's actual knowledge by POA of substantial completion supplemented the requirement for written notice as a condition precedent to performance. Hence, debtors failed to meet its burden as to section 3.3.

 Next, the City and County cited section 3.4 styled, "Cooperation During Construction," and the debtors' failure to cooperate so that the public and private portions of the Facility could open at the same time. To support its notice of default, the City and County contend that POA failed to construct the attractions so that the attractions could open along with the rest of the Pyramid. The City and County note that in July 1989, POA was reminded of the need for cooperation and coordination in construction of the improvements in the leased space. The Court has earlier noted the tumultuous relationship which existed between HHN and the debtors, which obviously impeded the construction.

The City and County recite numerous factors which allegedly evidenced the debtors' "failure to cooperate" during construction, including the fact that POA failed to timely effect construction of the attractions. The City and County further claim that the debtors failed to make decisions timely regarding particular items of work, to wit: The installation of additional pilings; debtors' failure to submit timely preliminary plans; the inadequacy of the plans finally submitted on September 22, 1989; the decisions regarding the size of the water cooling system; the type of glass to be used in the observation area skylight; and others. Numerous documents were introduced including change orders to evidence the communications that occurred between representatives of the debtors, the City, County, and The Pickering Firm through the auspicious of Bennett.[41]

On June 29, 1990, a project coordination meeting was held "to discuss areas needed

41. See Trial Exs. 354 and 356.

for coordination between Pyramid Operating Authority and Pyramid Management Authority wherein Huber, Hunt & Nichols contract with the Public Building Authority." (sic) Bennett at 2035–2038. See Trial Ex. 305. At that time, the inclinator was discussed as well as the efforts of Rosser Fabrap. During this meeting, the issue of cooperation was brought up and minutes taken by Bennett reflects: "Marshall Criss believed that the necessary coordination was being done, but Mr. Thurman was not convinced of this." Bennett at 2040.

It further appeared that many questions regarding details of various items, including door openings for the inclinator and the observation deck remained open and were in a need of action. It thus appears that cooperation was not what it should have been among the parties as the Court earlier addressed elsewhere in this opinion. The Court further notes that proper cooperation was problematic on both sides. Specifically, section 3.4 of the Hard Rock Lease specifically recites, "lessor and lessee agree to *use their best efforts* to cause *all of their agents* and *independent contractors* to act in a fashion to accomplish this goal." The contract imposes a reciprocal requirement that the parties use their "best efforts" to cause their agents and independent contractors to act in a good faith fashion. The City and County have *not* shown that the debtors failed to use their "best efforts" to cause their agents and independent contractors to act in a fashion to accomplish the successful completion of the project. Nor has the City and County shown that it carried its burden to use its "best efforts" to cause its contractors, HHN and Pickering, to "act in good faith." Thus, since equity abhors an unjust result, and the party seeking to allege the default has not demonstrated compliance, the Court will not countenance the City and County's claim of a material default under section 3.4.

■ It is undisputed that the lessee's improvements and other activities were not completed consistent with the opening of the arena. In fact many of the lessee's improvements as of the hearing date, still

have not occurred. However, the City and County have not shown that the debtors breached their duty under section 3.4 by not using their "best efforts to supervise" their agents and contractors. The statement by Criss that he believed that the necessary coordination was being done evidences a belief on his part, even though that belief differs from Thurman's, that some cooperation was occurring. Assuming arguendo that a default under this provision did occur, this default itself can not be deemed sufficiently material under the contract to warrant termination since the default would have gone to the duty to "coordinate" which was an equal responsibility of both parties, and did not go to the ultimate "installation" of lessee's improvement.

■ Next, the City and County alleged a default under section 6.1. Section 6.1 prohibits the assignment without prior written consent and states in relevant part that:

> Lessee shall not assign or transfer all or any portion of its interest in this lease or the premises or sublet the premises or any part thereof, or any manner transfer this lease, the leasehold created hereby or the Premises, without first obtaining the prior written consent of lessor provided that Lessee may sublease ... to any affiliates of lessee without the consent of Lessor.

The City and County successfully showed that assignments had occurred to others than affiliates of the debtors and therefore an event of default occurred under section 6.1. While the City and County did not consent to the assignments, the proof revealed that City and County had knowledge of the assignments.

■ This Court now reviews section 10.6 of the Hard Rock lease agreement that dealt with liens. The section provided that "lessee shall not suffer or permit any materialmen's, mechanics, artisans, suppliers or other liens to be filed or placed or exist against the land or building of which the premises are a part, or lessee interest in the premises by reason of work, services or materials supplied or claimed to have been

supplied to lessee." The City and County specifically referred to the lien against the Pyramid for the work done by Ellerbee Beckett.

Debtors' principal, Criss, admits that Ellerbee Beckett *filed* a lien against the Pyramid for the work performed on behalf of POA. See Criss at 639–640; Shlenker at 1672. Debtors contend that this does not, however, constitute a default because no such lien could attach to a public facility. Debtors were in close contact with the office of the County Attorney and in fact had received a legal opinion that no lien could be placed against the Pyramid. See Exs. 84–85. Further, the lien expired by its terms prior to the issuance of the City and County's April 16, 1991 notice of default. Thus, since debtors in its actions relied on a legal memorandum issued from the City and County, the City and County may not in good faith allege a material default on this basis. Further, assuming arguendo that the Ellerbee Beckett lien was filed, the lien did not attach to the property and thus could not have constituted a *material* event of default pursuant to the terms of the contract.

Considering the foregoing discussion as to POA, the Court finds that the Hard Rock Lease was effectively terminated. The more detailed April 16 notice of default as to POA, put the debtor on notice and established a cure period. Since there was no good faith dispute provision in the lease to suspend the debtor's obligation to perform, the lease was effectively terminated by the City and County's June 17, 1991 letter. Thus, there remains nothing for the debtor to assume pursuant to the provisions of 11 U.S.C. § 365.

## MSU AGREEMENT

■ We next consider whether the "MSU Agreement" was effectively terminated. As earlier stated, under a "Finance and Use Agreement,[42] executed August 26, 1988, between the State of Tennessee and the City and County, the State agreed to contribute seven million dollars ($7,000,000)

toward the construction of the Pyramid, in return for which MSU would receive certain rights related to the facility. PMA was selected to manage, operate, promote, and market the pyramid, including the skyboxes. See Trial Ex. 12, Pyramid Management Agreement.

After execution of the PMA Management Agreement, PMA began negotiations with MSU to manage MSU's interests. An agreement ("MSU Agreement"),[43] was executed between PMA and the Tennessee Board of Regents ("TBR") effective August 3, 1990.

A major element in the MSU Agreement centered on the skyboxes. Under the MSU Agreement, PMA assumed responsibility for furnishing the eleven (11) skyboxes which MSU had the responsibility to furnish under the Finance and Use Agreement. PMA was given the right to retain all revenues from the rentals of skyboxes in which MSU had an interest, in effect giving PMA control over most of the skyboxes.

At section 5(d), the MSU Agreement provided that "this Agreement *shall* terminate, effective immediately thereupon, if and when the PMA Agreement should *effectively terminate.*" (Emphasis added).

On June 17, 1992, the City and County issued a letter informing PMA that the Agreement was being terminated. On June 26, 1991, based on the City and County's action, MSU sent a letter to debtor, PMA, terminating the MSU Agreement. See Trial Ex. 78.

As to any allegations of default under the MSU Agreement, the non-defaulting party was required to give notice, as provided under paragraph 22 of the MSU Agreement which states:

22. ***Default Notices.*** The non-defaulting party *shall promptly notify the defaulting party of any acts or omissions* believed by the non-defaulting party to be an Event of Default under this Agreement. In order to be effective for purposes of Provision 20 and 21 or to consti-

---

42. See Trial Ex. 8.

43. See Trial Ex. 25.

836

tute *Just Cause* for termination of this Agreement, a notice of a default must be *timely given,* must state that it is a notice of default and must specify in detail the *acts or omissions alleged to constitute a default of this Agreement.*
(Emphasis added).

Thus, MSU, in seeking to rely on any alleged Event(s) of Default under the PMA Management Agreement, was required to provide *timely notice* and *specific acts or omissions* which formed the basis for any alleged default.

MSU provided no notice to debtors of any default, nor did MSU allege any reliance on the above provisions as a basis for relief in its June 26, 1991 notice of termination issued to the debtors. Instead, MSU relied on section 5 of the MSU Agreement, styled "Term", which defined the term of the Agreement and the circumstances for expansion or reduction of said term. The contract provided for an initial five (5) year term. See ¶ (a). At paragraph (c), the MSU Agreement provides in relevant part:

.... Should PMA be in default at any time or there is Just Cause against PMA, which default or Just Cause has not been cured *within any applicable period for cure,* then, at MSU's option, (i) this Agreement shall terminate....

(Emphasis added). The MSU Agreement provided for a "thirty (30) day" or reasonable period to cure.

On June 26, 1991, when MSU informed PMA that the MSU Agreement, see Trial Ex. 25, had terminated effective June 17, 1991, MSU cited only the automatic termination provision of the Management Agreement. See Trial Ex. 12. The Court has earlier found that the MSU Agreement was an independent legal document; however, certain rights and obligations of the MSU Agreement were defined by reference to the Management Agreement and therefore depend in part on the Management Agreement.

Further, the Court observes that the MSU Agreement has a separate Definition, separate Default Notice, and Events of Default sections. The MSU Agreement pro-

vides for, at the election of the non-defaulting party, "the right to terminate this Agreement" if an Event of Default occurs. Events of defaults are governed by paragraph 20, which provide in toto:

20. ***Events of Defaults.*** Each of the following shall constitute an "Event of Default" under this Agreement:

(a) Failure to pay when due any amount required to be paid under this Agreement, if the failure continues for five (5) days after notice has been given to the defaulting party; or,

(b) Failure to perform any obligation under *this Agreement,* if the failure to perform is not cured within thirty (30) days after notice has been given to the defaulting party, except that if the default cannot reasonably be cured within thirty (30) days, an Event of Default shall not be deemed to have occurred if the defaulting party begins to cure the default within the thirty (30) day period and *diligently and in good faith continues to pursue the cure of the default.*

(Emphasis added). It is significant to note that the failure to perform an obligation under the Management Agreement is not listed as a specific event of default under the MSU Agreement, notwithstanding the interdependence of the two agreements.

MSU based its decision to terminate on the automatic termination provision of section 5(d). Accordingly, MSU sent no notice, allowed no opportunity for cure, plead no events of default, but relied strictly on the forfeiture provision in the contract. By so doing, MSU bound itself inextricably to the position and propriety of the City and County's actions. In order for MSU's termination to be *effective,* as a condition precedent, there must have been an effective termination by the City and County. Thus, the Court's earlier finding of an ineffective termination becomes fatal to MSU's position.

Next, MSU contends that even if the MSU Agreement is found not to have been effectively terminated, it may not be assumed. In furtherance of its position, MSU argues that once termination oc-

curred, neither the terms of the Agreement itself nor applicable state law would permit PMA to revive or resurrect the contract. MSU submits that PMA might have a legal cause of action if either the MSU Agreement or the Management Agreement were improperly terminated, which cause of action would become property of the PMA bankruptcy estate. *See* 11 U.S.C. § 541. However, insists MSU, the letter of termination effectively eliminated any executory contract between PMA and MSU, and between PMA and the City and County, prior to the filing of PMA's chapter 11 petition.

■ This Court disagrees. In construing the contract, the Court must give effect to the language of the contract. Both the Management Agreement and the MSU Agreement used the term "effective termination". The phrase "effective termination" is not defined in either of the contracts, the Management Agreement nor the MSU Agreement. The Court will then apply a plain meaning definition. *See Memphis Friday's*, 88 B.R. at 834.

Webster's defines "effective" as:

1. Having an effect; producing a result. 2. Producing a definite or desired result; efficient. 3. In effect; operative; actual. 4. Actual, not merely potential or theoretical.

Webster's defines "ineffective:

1. Not effective; *not producing the desired effect;* ineffectual. 2. Not capable of performing satisfactorily; incompetent; inefficient.

(Emphasis added) Thus, in order for the termination letter to have been effective, its intended objective must have been accomplished. Such was not the case with the June 17, 1991 letter purporting to terminate the contract.

This Court has found from the totality of the surrounding facts and circumstances, from the actions of the parties to the contract, and from the four corners of the contract, that the purported termination as to PMA Agreement, and hence the MSU Agreement were ineffective. An ineffective prepetition termination leaves the contract full, alive, and viable, and therefore assumable. Because of the ineffective termination, the MSU Agreement never died and therefore does not require resuscitation. Since the MSU Agreement is viable, it is subject to the assumption provisions of 11 U.S.C. § 365.

■ MSU argues further that PMA's position reads too much into section 365. Accepting PMA's analysis, MSU argues, would logically lead to the conclusion that a debtor could attempt to assume any contract terminated prepetition simply by alleging that the termination was "improper" or "invalid"—even if such termination occurred months or even years prior to the filing of the petition and even if the debtor had no rights under either the contract or applicable nonbankruptcy law to revive the contract prior to the filing of a bankruptcy petition. Section 365 does not go that far, and does not create rights in property which did not exist as of the date of filing of the bankruptcy petition. Such a conclusion results in little harm to a debtor since a debtor would still possess a property interest in any cause of action for breach of contract that existed prior to the filing of the bankruptcy petition, MSU contends.

The *Court* will not venture in this area, but will deal only with the language of the contracting parties at the time the contracts were written. The parties chose their language regardless of how precise or imprecise, and the Court will not allow the parties through hindsight to write a new contract. The language of the contract required an effective termination. While the Court is mindful that these particular counselors may not have been the drafters; they, like the Court, are stuck with the language.

■ The Court rejects MSU's argument that, even assuming an improper termination by MSU, applicable Tennessee law would not permit PMA to revive the MSU Agreement once terminated. MSU avers that absent a specific provision in the contract allowing PMA to reinstate the MSU Agreement once terminated, PMA's remedies under Tennessee law against MSU would be limited to commencing a lawsuit seeking damages. According to MSU, the

remedy of specific performance would be unavailable to PMA under applicable Tennessee law. MSU contends that PMA's sole remedy would be an action pursuant to the Tennessee Claims Commission Act.[44]

 The Court finds this argument untenable for the following reasons. First, the ineffective termination left the contract intact under applicable rules of law and relevant principles of equity. Second, the Bankruptcy Court is a court of equity, and may order the equitable relief of specific performance, as well as any other appropriate form of equitable relief. See 11 U.S.C. § 105. Equity looks to the intent rather than the form. *Newman v. Aluminum Co. of Am.,* 643 S.W.2d 109, 111 (Tenn.Ct. App.1982). Equity looks not to the outward form but to the inward substance of every transaction. *Halco Fin. Servs., Inc. v. Foster,* 770 S.W.2d 554, 555 (Tenn.Ct. App.1989). "Equity considers the real and the substantial, and allows no rule of evidence at law, ... and no acts or subterfuges of parties, to tie its hands, or shackle its feet, or dim-its [sic] sight, in searching for the real truth of the transaction under investigation." *Id.* n. 3 (quoting *Gibson's Suits in Chancery* ), § 43 at p. 60 (4th ed. 1937). Further, equitable relief is broad so as not to sanction an unjust result. *Id.*

 A court of equity has the power and authority to make a decree based upon equitable principles in the light of all the facts and circumstances involved. *Bennett v. Howard Johnsons Motor Lodge,* 714 S.W.2d 273, 281 (Tenn.1986). Additionally, the MSU Agreement recognized a remedy of specific performance at paragraph 5(e) of the MSU Agreement which provides that "the named defaulting party ... has the *right to seek specific performance* of the defaulted obligation." (Emphasis added). Thus, having considered all the facts and circumstances involved, the Court finds that the debtors' remedies may not be so limited.

Finally, the contract requires "claims against the state for breach," to be submitted to the Tennessee Claims Commis-

sion. This language contemplates damage claims and not issues regarding the ultimate existence or non-existence of the contract.

## CONCLUSION

Based on all the foregoing, and considering the totality of the particular facts and circumstances, this Court concludes that the PMA Management Agreement was not effectively terminated because of the insufficient notice given by the City and County under the April 16, 1991 notice of default which did not allege "specific acts and omissions" giving rise to events of default; and because the good faith dispute provision of section 11.05 had been invoked by the debtor, PMA, thus preventing effective termination prior to an adverse determination against the debtors. The City and County's June 17, 1991 termination letter was a unilateral adverse determination in contravention of the language of section 11.05, and therefore not operative to work an effective termination of the contract. *See Turner* 657 S.W.2d at 97. The Management Agreement is therefore viable and capable of assumption pursuant to the provisions of section 365 of the Bankruptcy Code.

The Court finds that inasmuch as there was no effective termination of the Management Agreement by the action of the City and County, the June 26, 1991 termination of the MSU Agreement, which was premised on an effective termination of the PMA Agreement, was likewise not effectively terminated, and is therefore capable of assumption pursuant to the provisions of 11 U.S.C. § 365.

The Court finds, based on a totality of the facts and circumstances surrounding the Hard Rock Lease, the notice given by the City and County was sufficient under the provisions of the contract. Defaults were not cured within the time specified. The contract contained no "good faith dispute" clause to allow for a suspension of the obligation to perform. Hence, upon the expiration of the cure period, since POA had not cured the alleged defaults, the City

---

**44.** Tenn.Code Ann. § 9–8–301, *et seq.*

and County properly exercised its right of termination. Thus, the POA/Hard Rock lease was effectively terminated and is therefore incapable of assumption. *See Memphis–Friday's,* 88 B.R. at 840. The Court abstains in favor of the state court as to those issues regarding the Escrow Agreement.

By separate order, the Court will set a pre-trial conference with respect to the PMA Management Agreement on the cure, compensate and assure issue. The ore tenis motion of MSU to dismiss is denied.

IT IS SO ORDERED.